PER CURIAM.
Gregory Lance Henderson was convicted of capital murder under § 13A-5-40(a)(6), Ala. Code 1975, for the intentional murder of an on-duty law-enforcement officer, Deputy James Anderson. At sentencing, the jury completed a series of special interrogatories regarding aggravating circumstances pursuant to § 13A-5-49, Ala. Code 1975, and found unanimously that the capital murder was committed while Henderson was under sentence of imprisonment, § 13A-5-49(1) ; that Henderson had previously been convicted of a felony involving violence or the threat of violence to another person, § 13A-5-49(2) ; that Henderson committed the murder for the purpose of avoiding or preventing lawful arrest or to effect an escape from custody, § 13A-5-49(5) ; and that the offense was committed in order to hinder or disrupt the lawful exercise of a government function or enforcement of the laws, § 13A-5-49(7). The jurors did not unanimously find that the murder was especially heinous, atrocious, and cruel, § 13A-5-49(8). The jury recommended, by a 9-3 vote, that Henderson be sentenced to life imprisonment without the possibility of parole. At the final sentencing hearing, the trial court overrode the jury's recommendation and sentenced Henderson to death. The trial court entered a lengthy and thorough sentencing order. The trial court entered specific findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975. The trial court found four aggravating circumstances: that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1) ; that Henderson had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, § 13A-5-49(2) ; that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, § 13-A-5-49(5); and that the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, § 13A-5-49(7). The trial court found no statutory mitigating circumstances to exist. The trial court found the following nonstatutory mitigating circumstances to exist: that Henderson had expressed remorse; that *1001 Henderson was under the influence of methamphetamine at the time of the offense; that Henderson had been diagnosed as having an antisocial personality disorder and displaying poor judgment; that Henderson had no violent disciplinary infractions while he was in jail awaiting trial; that Henderson joined the Navy when he was 19 years old; and that Henderson had a good relationship with his children. Pursuant to Ex parte Carroll, 852 So.2d 833 (Ala. 2002), the trial court considered the jury's recommendation that Henderson receive a sentence of life imprisonment without the possibility of parole as a mitigating circumstance. The trial court then found that the aggravating circumstances vastly outweighed the mitigating circumstances and sentenced Henderson to death.
Facts
On September 24, 2009, Deputy Anderson and Deputy Katie Bonham of the Lee County Sheriff's Department were on routine patrol when they encountered a white Honda Civic automobile that Henderson was driving. Deputy Bonham was driving the patrol car, and Henderson was traveling in the opposite direction. She testified that Henderson pulled into a driveway as they passed him, and then he immediately pulled back out onto the road and continued driving. It appeared to the officers that Henderson was attempting to evade them, so Deputy Bonham turned the patrol car around and followed him. Deputy Anderson contacted the dispatcher at the sheriff's office to check the license plate on the car. When the dispatcher reported that the license plate was registered to an older model black Ford Thunderbird automobile, the deputies decided to conduct a traffic stop. Henderson drove into another driveway. Deputy Bonham turned on the blue lights on the patrol car, which automatically activated the video-recording system in the car. While in the driveway, Henderson turned the Honda to the right. Deputy Anderson quickly got out of the passenger's seat of the patrol car, drew his gun, and yelled at Henderson repeatedly to stop. Deputy Bonham testified that Henderson backed up to try to escape down the driveway so she drove the patrol car behind him to block him from doing so. Deputy Anderson was on the driver's-side of Henderson's car and, Deputy Bonham testified, "Henderson pressed the accelerator as far as it would go and piled over Deputy Anderson." (R. 1782.) Deputy Anderson was dragged a few feet by the vehicle and then remained pinned under Henderson's car when Henderson stopped driving forward. Deputy Bonham got out of the patrol car and fired two shots at Henderson. One shot entered the driver's-side door frame, and the second shot hit the engine block. Henderson laid his head over as if he had been shot, Deputy Bonham said, so she paused for a moment. Henderson then grabbed the steering wheel and accelerated repeatedly. He appeared to shift the car from "reverse" to "drive," and he accelerated each time he shifted gears. The tires were in the dirt, so each time Henderson accelerated the tires spun and dug deeper into the ground. The Honda sank further down on top of Deputy Anderson. Deputy Bonham repeatedly ordered Henderson to get out and to lie on the ground. Henderson did not initially comply, but he did eventually get out of the car and lie on the ground.
Henderson cried and repeatedly asked Deputy Bonham to help get Deputy Anderson from under his car, but she held him at gunpoint until she received backup assistance and Henderson was placed in handcuffs. Before backup assistance arrived, the resident of the house where this incident took place came outside. He testified that he brought a jack to lift the Honda, but that the car was too low and he could not get the jack under the car. When emergency personnel and law-enforcement officers began to arrive, additional efforts *1002 were made to get Henderson's car off of Deputy Anderson. Car jacks were used in an attempt to raise Henderson's vehicle, but the jacks sank into the dirt and did not raise the vehicle enough to pull the deputy out.
Deputy Bonham testified that when she looked under the car, Deputy Anderson was not moving or talking and she was not sure whether he was breathing. More time passed before a tow truck came to the scene and raised Henderson's car off Deputy Anderson. CPR was administered and Deputy Anderson was transported to the hospital, but he did not survive. The forensic pathologist who performed the autopsy testified that Deputy Anderson suffered burns, abrasions, fractures of the sternum and three ribs, and hemorrhages in the muscles around the ribs. Those injuries were not sufficient to have caused death or immediate unconsciousness, the pathologist said. The cause of death was determined to be traumatic asphyxia that resulted from the weight of the vehicle on his chest that prevented him from being able to breathe, and it resulted in the fatal lack of oxygen to his brain. The pathologist further testified that when a brain is deprived of oxygen for approximately four minutes, irreversible brain injury occurs and, at that point, Deputy Anderson could not have been resuscitated.
Investigators processed the scene. A law-enforcement officer found a large blade between the driver's seat and the door of the Honda. The State presented evidence from the investigation of the crime, including photographs and a diagram of the scene and the recording from the video camera in the patrol car.
Henderson presented testimony from Dr. Glen King, a clinical and forensic psychologist who conducted a mental evaluation of Henderson before trial and prepared a written report. Dr. King made three diagnoses: cannabis dependence, amphetamine dependence, and antisocial personality disorder. Dr. King also stated in the report that Henderson was likely intoxicated at the time of the crime. On cross-examination, Dr. King testified that, based on further consideration after he submitted the report, it was his opinion that Henderson was not intoxicated or impaired at the time of the offense.
A forensic toxicologist testified that she had tested a sample of Henderson's blood that was taken when he arrived at the jail, several hours after Deputy Anderson died. Henderson's blood contained methamphetamine and an inactive metabolite of marijuana. The levels of methamphetamine would have been higher had Henderson's blood been taken closer to the time of the incident, she said. The toxicologist testified that methamphetamine is a stimulant and that a person with the level of methamphetamine found in Henderson's blood could be impulsive, easily distracted, and have excessive energy but that she could not testify as to any impairment Henderson might have actually experienced.
In the State's rebuttal case the nurse at the Russell County jail testified that she drew Henderson's blood and obtained a urine sample during her routine assessment of Henderson as a new inmate, and that, as part of that assessment, she asked Henderson about his drug use. Henderson told her that he only used marijuana and alcohol and that he had not ingested either of those substances in the previous two days. Although Henderson did not admit to recent methamphetamine use, his urine sample tested positive for methamphetamine. The nurse testified that she could not tell whether Henderson was under the influence of drugs or alcohol during her assessment and that she did not treat him for symptoms of withdrawal from intoxicants while he was at the jail.
*1003 At the sentencing hearing before the jury, a Georgia probation and parole officer testified that, in 2008, he had been assigned to supervise Henderson after Henderson was released from prison following a conviction for aggravated assault. The officer testified that Henderson had been on probation for methamphetamine possession when he committed the aggravated assault, thus violating his probation and resulting in his imprisonment. In July 2009, a felony-fugitive warrant was issued because Henderson had failed to comply with the conditions of his parole and he had moved from his residence without notifying his parole officer. On September 21, 2009, three days before Henderson killed Deputy Anderson, Georgia parole officers assembled an arrest team after a tipster provided information that Henderson was at an auto shop. While en route to the auto shop the officers saw Henderson at the wheel of a white Honda Civic in the drive-through lane at a fast-food restaurant. Two of the officers got out of their car to approach Henderson, and the third officer began to drive to the front of the drive-through lane in an attempt to block Henderson's vehicle. When Henderson saw one of the officers he "floored" the gas and sped away. He drove around a customer's car in front of him, swerved around several cars in the parking lot, jumped a curb, and drove through a gas station parking lot. Henderson successfully evaded arrest on the fugitive warrant.
Henderson's mother testified about Henderson's childhood and said she was a strict disciplinarian, but that she and her husband had openly expressed love for Henderson and his brothers. She said that Henderson had been diagnosed with attention deficit hyperactivity disorder ("ADHD") when he was approximately six years old and was prescribed medication for the condition. He made good grades while he was taking the medication, but he dropped out of high school after he stopped taking the medication and began making failing grades. She said that, during his teenage years, Henderson began to get into trouble and he began smoking marijuana. Henderson's mother testified that Henderson had five children, that he had close relationships with them, and that he supported them financially.
At the sentencing hearing before the trial court Henderson presented his school records and reports of psychological evaluations conducted while he was in school. The reports consistently indicated that Henderson exhibited a pattern of behavioral characteristics, such as a short attention span, impulsivity, and overactivity. The reports also indicated that Henderson achieved an IQ score of 112 on the test administered in the first grade, and he achieved an IQ score of 107 on the test administered in the fourth grade. Henderson achieved an IQ score of 96 on the test administered in the seventh grade. He made A's and B's through the fifth grade, and his grades in many classes were lower during the rest of his school years.
Henderson testified at the sentencing hearing before the trial court. He testified about his extensive drug history and said that he was under the influence of methamphetamine, Xanax, and marijuana when he ran over the deputy. He further testified that he had not slept for at least seven days before he ran over Deputy Anderson because he had been using illegal drugs. Henderson admitted that he had seen several law-enforcement officers the day of the murder and that he was relieved when they did not stop him because, he said, he had no insurance or driver's license and because he had been using drugs. Henderson testified that he pulled into several driveways, including the final one where he ran over Deputy Anderson, solely because he was lost and was trying to *1004 get back to a road that he recognized. He stated that he had not seen the patrol car drive behind him in the driveway and that he saw the patrol car and Deputy Anderson only after he had turned around and was already moving forward toward the end of the driveway. Henderson said that it was too late to stop the car and he rolled over the deputy. He said he tried to back the car up several times because he knew the deputy was under the car, but the tires spun and the car would not move. Henderson testified that he asked Deputy Bonham to help him get the car off Deputy Anderson. Henderson denied telling anyone earlier that day that he would kill any officer who stopped him. He acknowledged that in a telephone call he made from the Russell County jail he had asked that someone talk to Alexandria Barfield, who he knew would testify at the sentencing hearing, so she would understand that she should not permit the prosecutor to trick her into believing she was helping Henderson.
Alexandria Barfield testified that she had dated Henderson in 2009. She said that she had been in Henderson's white car at some point before the incident[1] that caused Deputy Anderson's death. Barfield acknowledged that she gave a statement to a law-enforcement officer after the murder and she told the officer that, before the day the deputy was killed, Henderson had told her that if he ever got pulled over by a policeman she should duck down in the floorboard because he was going to shoot the policeman. Barfield said she had been high on methamphetamine on the day Henderson made that statement to her and again when she told the law-enforcement officer about Henderson's statement. She testified at the sentencing hearing that she was not high on drugs and had not used any drugs in more than 24 hours.
The Russell County jail administrator testified that while Henderson was incarcerated there he had two disciplinary infractions-he had refused to "lock down" for a head count and he failed to report that some of the security screws in the window in his cell were loose.
Standard of Review
Rule 45A, Ala. R. App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
The standard of review for a claim of plain error is as follows:
" 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1[, 105 S.Ct. 1038, 84 L.Ed.2d 1] (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affects] the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala. 1998).' "
Ex parte Brown, 11 So.3d 933, 935-36 (Ala. 2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim. App. 1999) ). See also *1005 Towles v. State, 168 So.3d 133 (Ala. 2014) (quoting Ex parte Brown ).
"In United States v. Young, 470 U.S. 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Fray [Frady], 456 U.S. 152, 163[, 102 S.Ct. 1584, 71 L.Ed.2d 816] (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157] , at 160[, 56 S.Ct. 391, 80 L.Ed. 555] [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Fray [Frady], 456 U.S. at 163, n. 14.' "
Brown, 11 So.3d at 938.
I.
Henderson first argues that the trial court's instructions on specific intent require a reversal. Specifically, Henderson argues that the trial court erred when it instructed the jury that it could presume intent from the use of a dangerous instrument. He argues that an instruction that intent can be presumed from a defendant's act created a mandatory presumption that unconstitutionally shifted the burden of proof to him. Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). He argues also that intent to kill can be inferred only from the use of a deadly weapon and not from the use of a dangerous instrument. Henderson did not object at trial to these jury charges so we review this issue for plain error only.
" ' "In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that 'an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' Williams v. State, 710 So.2d 1276, 1306 (Ala. Crim. App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997)." '
" Broadnax v. State, 825 So.2d 134, 196 (Ala. Crim. App. 2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala. Crim. App. 1998) [overruled on other grounds, 789 So.2d 888 (Ala. 2000) ]. Moreover, '[w]hen reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala. Crim. App. 1999).' Johnson v. State, 820 So.2d 842, 874 (Ala. Crim. App. 2000)."
Snyder v. State, 893 So.2d 488, 548 (Ala. Crim. App. 2003). See also Maples v. State, 758 So.2d 1, 65 (Ala. Crim. App.), aff'd, 758 So.2d 81 (Ala. 1999).
A.
The trial court instructed the jury on the intent to kill as follows:
"A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific."
(R. 2416-17.)
"The element of intent being a state of mind or mental purpose is usually incapable of direct proof, and it may be inferred from the character of the assault and the use of a dangerous instrument and other attendant circumstances. Intent may be presumed from the act of using a dangerous instrument and/or from the character of the assault, including the nature *1006 and the amount of force used in the fatal injury.
"The intention to do great bodily harm to murder or commit any other crime by means of an assault may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention. The intention may be inferred from the use of-from the force or direction or from the natural or contemplated results of the violence employed from the dangerous instrument or implemented use by the accused and generally from the extent and affect of the injury [inflicted] or from any deliberate action which is in the natural attempted and-which is naturally attempted and usually results in danger to the life of another.
"The intent to cause the death of the deceased may be inferred from the character of the assault, the use of a dangerous instrument and all other attending circumstances surrounding the death of the deceased."
(R. 2446-49.) (Emphasis added.)
The court then defined a "dangerous instrument" as:
"Any instrument, article or substance, which, under the circumstances in which it is used, attempted to be used, or threatened to be used is highly capable of causing serious physical injury. The term includes a vehicle ....
(R. 2449-50.)
Thus, the trial court on one occasion incorrectly stated that intent could be presumed, but before and after that incorrect statement, the trial court repeatedly instructed the jury that intent could be inferred.[2] The trial court's single reference to the presumption of intent was not brought to the trial court's attention by way of objection, and it does not constitute plain error because it was not an error that "has or probably has adversely affected the substantial right of the appellant." Rule 45A, Ala. R. Crim. P.
We note, furthermore, that the Alabama Supreme Court in Ex parte Burgess, 827 So.2d 193 (Ala. 2000), reached the same result in a case presenting similar circumstances. The Court held:
"[W]e notice the recitation [in the Court of Criminal Appeals' opinion] that the trial court 'further instructed [the jury] that, while intent to commit murder may be presumed from the defendant's act of using a deadly weapon, the presumption will not support the conviction of capital murder.' Burgess v. State, 827 So.2d [134, 189 (Ala. Crim. App. 1998).] (Emphasis added.) An instruction that 'intent to commit murder may be presumed from the defendant's act of using a deadly weapon,' would unconstitutionally shift to the defendant the burden of proving lack of specific intent. Yates v. Evatt, 500 U.S. 391[, 111 S.Ct. 1884, 114 L.Ed.2d 432] (1991) [overruled on other grounds, Estelle v. McGuire, 502 U.S. 62 1991[, 112 S.Ct. 475, 116 L.Ed.2d 385] (1991) ] ; and Sandstrom v. Montana, 442 U.S. 510 (1979). The correct instruction on this particular point would be that intent to kill may be inferred from the defendant's act of using a deadly weapon. Sparks v. State, [261 Ala. 2, ]75 So.2d 103 (1953) ; and Douglas v. State, [42 Ala.App. 314, ]163 So.2d 477, 490 (1963), overruled on other grounds, *1007 380 U.S. 415[, 85 S.Ct. 1074, 13 L.Ed.2d 934] (1965). Ex parte Bayne, 375 So.2d 1239, 1244 (Ala. 1979), is overruled to the extent that it misconstrues Douglas, supra, and allows an instruction that intent may be presumed, as distinguished from inferred, from the use of a deadly weapon.
"We have, however, reviewed the entire text of the trial judge's jury instruction on this point. While the trial judge did, toward the beginning of his instruction, say that the intent 'may be presumed,' he then promptly and correctly changed his terminology to say that the intent 'may be inferred' and he concluded his instruction on this topic with the correct 'may-be-inferred' terminology. The absence of any objection by the defendant specifically directed to the court's initial incorrect verbiage that intent 'may be presumed' suggests that the defendant was satisfied that the trial judge's corrected language was adequate to eliminate any prejudice from the initially incorrect language. See Ex parte Woodall, 730 So.2d 652, 657 (Ala. 1998) ; [ Kuenzel v. State, 577 So.2d 474 (Ala. Crim. App. 1990) ], aff'd, 577 So.2d 531 (Ala.), aff'd, 502 U.S. 886[, 112 S.Ct. 242, 116 L.Ed.2d 197] (1991) ; and Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala. 1985). Accordingly, we find no plain error in this regard."
Burgess, 827 So.2d at 199-200.
Based on the Alabama Supreme Court's analysis in Ex parte Burgess and on our own plain-error review, we hold that Henderson is not entitled to relief based on the trial court's single reference to a presumption of intent.
B.
Henderson argues that the trial court erred when it instructed the jury that it could infer specific intent to kill based on his use of a dangerous instrument-a vehicle-although Alabama law provides that the specific intent to kill can be inferred from the use of a deadly weapon. Not only did Henderson fail to object to the trial court's instructions that the intent to kill could be inferred from his use of a dangerous instrument, he specifically stated that he had no objection to those instructions so long as the phrase "dangerous instrument" was substituted for the phrase "deadly weapon." Therefore, any error in the trial court's instruction was invited error.
" ' "Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State, 527 So.2d 154, 156 (Ala. 1988). "The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error." Snyder v. State, 893 So.2d 488, 518 (Ala. Crim. App. 2003).' "
Robitaille v. State, 971 So.2d 43, 59 (Ala. Crim. App. 2005).
To obtain a capital-murder conviction the State was required to prove that Henderson had the specific intent to kill Deputy Anderson. "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct." § 13A-2-2(1), Ala. Code 1975. This Court has repeatedly observed that intent is a state of mind that is rarely, if ever, established by direct evidence and must be inferred from the facts. E.g., Chambers v. State, 181 So.3d 429, 434 (Ala. Crim. App. 2015) ; Morton v. State, 154 So.3d 1065, 1080 (Ala. Crim. App. 2013) ; Brown v. State, 11 So.3d 866, 914 (Ala. Crim. App. 2007).
"Intent may be inferred from the use of a deadly weapon. See Long v. State, 668 So.2d 56, 60 (Ala. Crim. App. 1995) ;
*1008 Buskey v. State, 650 So.2d 605, 609 (Ala. Crim. App. 1994). Additionally, '[t]he question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve.' Rowell v. State, 570 So.2d [848,] 850 [Ala. Crim. App. 1990], citing Crowe v. State, 435 So.2d 1371, 1379 (Ala. Crim. App. 1983). Intent may be ' "inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances." ' Jones v. State, 591 So.2d 569, 574 (Ala. Crim. App. 1991), quoting Johnson v. State, 390 So.2d 1160, 1167 (Ala. Crim. App. 1980)."
Waldrop v. State, 859 So.2d 1138, 1162 (Ala. Crim. App. 2000), aff'd, 859 So.2d 1181 (Ala. 2002).
Section 13A-1-2(7), Ala. Code 1975, defines "deadly weapon" as:
"[a] firearm or anything manifestly designed, made, or adapted for the purposes of inflicting death or serious physical injury. The term includes, but is not limited to, a pistol, rifle, or shotgun; or a switch-blade knife, gravity knife, stiletto, sword, or dagger; or any billy, black-jack, bludgeon, or metal knuckles."
Section 13A-1-2(5), Ala. Code 1975, defines "dangerous instrument" as "[a]ny instrument, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is highly capable of causing death or serious physical injury. The term includes a 'vehicle' [ ] ...."
As part of its charge on intent, the trial court instructed the jury that "[t]he intention to do great bodily harm to murder or commit any other crime by means of an assault may be inferred from the circumstances." (R. 2448.) The trial court also charged the jury that "[t]he intent to cause the death of the deceased may be inferred from the character of the assault" along with "all other attending circumstances surrounding the death of the deceased." (R. 2449.) Even without the parties' requested substitution of "dangerous instrument" for "deadly weapon," the jury could easily have determined from Henderson's use of the vehicle, from the character of the assault, and from the other attending circumstances that Henderson acted with the specific intent to kill Deputy Anderson. The State's evidence established that Deputy Anderson stood, with his gun drawn, at the driver's side of Henderson's car and that Henderson drove his car forward at full speed, ran into and then over Deputy Anderson, and pinned him under the car. The evidence further indicated that Henderson continued to accelerate and he spun the wheels forward and then backward over Deputy Anderson as he tried to drive away. As a result of Henderson's actions, Deputy Anderson suffered burns, abrasions, and fractures, and the cause of his death was traumatic asphyxia that resulted from the weight of the vehicle on his chest.
An appellate court will find plain error in the context of a jury instruction only "when there is a reasonable likelihood that the jury applied the instruction in an improper manner." United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), citing Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). See Broadnax v. State, 825 So.2d 134, 196 (Ala. Crim. App. 2000) (quoting Chandler ), affirmed, 825 So.2d 233 (Ala. 2001). This Court is required to view the trial court's charge to the jury as a whole and not in bits and pieces, and we must view them as a reasonable juror would have interpreted them, e.g., Snyder v. State, 893 So.2d 488, 548 (Ala. Crim. App. 2003). Viewing the jury charge as a whole, we conclude that the substitution of "dangerous instrument" for "deadly weapon," at Henderson's request, did not rise to the level of plain error.
*1009 We note further that this Court has held repeatedly that objects other than those commonly considered to be deadly weapons can, in fact, be considered deadly weapons based on the way those objects were used. For example, in Harris v. State, 873 So.2d 1171 (Ala. Crim. App. 2003), the evidence established that Harris had thrown a jagged piece of a concrete block through the window of a car, striking the victim in the temple and inflicting a large gash to her head. The trial court enhanced Harris's sentence pursuant to § 13A-5-6(a)(5), Ala. Code 1975, which required proof that Harris had used a deadly weapon during the commission of a felony. Harris argued that the piece of the concrete block did not constitute a deadly weapon, but the trial court disagreed. On appeal, this Court affirmed, and thoroughly explained its analysis:
"The Commentary to § 13A-1-2, Ala. Code 1975, provides, in pertinent part:
" 'Many objects are not deadly per se and ordinarily have lawful functions and uses, but ... such object may constitute a "dangerous instrument" because it was used, or attempted to be used, in a manner rendering it "readily capable of causing death or serious physical injury." (A stick, rock, pencil or pen is capable of producing great harm or even death if jammed in a person's eye, ear or throat.) This definition essentially states previously existing law. The mere showing of the use of a fist does not make out use of a weapon. Corcoran v. State, 18 Ala.App. 202, 89 So. 835 (1921). Normally a shoe does not constitute a deadly weapon under former section 13-1-43, but it could under given circumstances. Cozart v. State, 42 Ala.App. 535, 171 So.2d 77 [ (1964) ], cert. denied, 277 Ala. 698, 171 So.2d 84 [ (1965) ]. An instrument or weapon used in inflicting injury may or may not be esteemed deadly, according to the manner of its use, and the subject on which it is used. Sylvester v. State, 72 Ala. 201 (1882). In other words, a deadly weapon is not only a weapon with which death may be easily and readily produced, but one which is likely to produce death or great bodily harm from the manner in which it is used. Williams v. State, 251 Ala. 397, 39 So.2d 37 (1948).'
"(Emphasis added.)
"In Ex parte Cobb, 703 So.2d 871, 876 (Ala. 1996), the Alabama Supreme Court stated: '[W]e conclude that the legislature intended to include as deadly weapons only things that are similar to the listed weapons.' However, the court went on to state: 'Only objects that are "designed, made or adapted for the purposes of inflicting death or serious physical injury" fit the definition of "deadly weapon." ' Id. See also Buchanan v. State, 602 So.2d 459, 460 (Ala. Crim. App. 1992) ('This court has stated that an item may become a ... deadly weapon depending on the manner in which the item is used. Davis v. State, 470 So.2d 1340 (Ala. Crim. App. 1985) ; Austin v. State, 555 So.2d 324 (Ala. Crim. App. 1989).'). In fact, this court has repeatedly held that items that are not specifically listed in § 13A-1-2(7), Ala. Code 1975, constituted deadly weapons based on the manner in which they were used. See Harris v. State, 705 So.2d 542 (Ala. Crim. App. 1997) (holding that a 16-ounce glass soft drink bottle was a deadly weapon as used in the case); Garrison v. State, 521 So.2d 997 (Ala. Crim. App. 1986) (holding that a board constituted a deadly weapon under the circumstances of the case); Jones v. State, 523 So.2d 518 (Ala. Crim. App. 1987) (holding that a tire tool constituted a deadly weapon based on the manner in which it was used); Hill v. State, 516 So.2d 876 (Ala. Crim. App. 1987) (holding *1010 that a baseball bat constituted a deadly weapon); Goolsby v. State, 492 So.2d 635 (Ala. Crim. App. 1986) (holding that a hammer, as used by the appellant in that case, constituted a deadly weapon). But see Ex parte Cobb, 703 So.2d 871 (Ala. 1996) (holding that fists or other body parts cannot constitute deadly weapons); Buchanan, supra (holding that thrown plastic flashlight did not constitute a deadly weapon)."
Harris, 873 So.2d at 1172-73.
This Court then held:
"[A] proper determination of whether an object constitutes a deadly weapon should be made based on the totality of the circumstances of the case, including the nature of the object, the manner in which it is used, and the circumstances surrounding its use. Under the circumstances of this case, we conclude that the piece of a concrete block the appellant threw into [the victim's] vehicle was 'adapted for the purposes of inflicting death or serious physical injury.' § 13A-1-2(7), Ala. Code 1975. Therefore, it constituted a deadly weapon ...."
Harris, 873 So.2d at 1174.
Therefore, the trial court could have charged the jury without substituting the terms as Henderson requested, and it could have instructed the jury that intent to kill could be inferred from the use of a deadly weapon as defined in § 13A-1-2(7), Ala. Code 1975. The statute defines "deadly weapon" as not only a firearm but also anything "adapted for the purposes of inflicting death or serious physical injury." The jury here could reasonably have found that, based on the "totality of the circumstances of the case, including the nature of the object, the manner in which it is used, and the circumstances surrounding its use," the vehicle was a deadly weapon and that Henderson acted with the specific intent to kill Deputy Anderson with that deadly weapon.
For all of the foregoing reasons, Henderson is not entitled to relief on this issue.
II.
Henderson argues that the trial court erred when it instructed the jury on flight when, he says, the evidence did not support an instruction on flight. He argues that the only evidence of an attempt to flee occurred when the deputies attempted to stop him for the traffic violation, and that there was no evidence of flight after he ran over Deputy Anderson. Henderson did not object at trial to the jury charge so we review this issue for plain error only.
" 'A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case.' Ingram v. State, 779 So.2d 1225 (Ala. Crim. App. 1999) (citing Raper v. State, 584 So.2d 544 (Ala. Crim. App. 1991) ).
" ' "In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), cited Boyde v. California, 494 U.S. 370, 380 (1990), for the proposition that 'an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' Williams v. State, 710 So.2d 1276, 1306 (Ala. Crim. App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997)." '
" Broadnax v. State, 825 So.2d 134, 196 (Ala. Crim. App. 2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala. Crim. App. 1998). Moreover, '[w]hen reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala. Crim. App. 1999).'
*1011 Johnson v. State, 820 So.2d 842, 874 (Ala. Crim. App. 2000)."
Snyder v. State, 893 So.2d 488, 548 (Ala. Crim. App. 2003).
Alabama caselaw has long held that evidence of flight or attempted flight in a criminal case is a circumstance that a jury may take into consideration in determining guilt or innocence. E.g., Bighames v. State, 440 So.2d 1231 (Ala. Crim. App. 1983). The State may offer evidence of flight to avoid prosecution for the charged crime to establish a defendant's consciousness of guilt. Even if evidence of flight is weak or inconclusive, the trial court may properly admit the evidence for the jury's consideration. E.g., Beaver v. State, 455 So.2d 253, 257 (Ala. Crim. App. 1984). Evidence that a defendant resisted or attempted to avoid arrest is also admissible as tending to show a defendant's consciousness of guilt. Id. See also Eggers v. State, 914 So.2d 883 (Ala. Crim. App. 2004) ; Travis v. State, 776 So.2d 819 (Ala. Crim. App. 1997), aff'd, 776 So.2d 874 (Ala. 2000).
The jury was charged as follows:
"When evidence tending to show flight is offered by the State, it may be considered by you, the jury, in connection with all of the other evidence in the case. In connection with such evidence, consideration should be given to any evidence of the motive which may have prompted such flight. That is, whether a consciousness of guilt or an apprehension of being brought to justice caused the flight or whether it was caused by some other motive. In the first place where evidence is offered to show the defendant's flight, that is, he went away from the scene of the alleged offense, it would be for you, the jury, to say whether it is flight as a matter of fact. The jury is to determine from the evidence the question of whether this was flight or not, and then you would further consider such evidence in light of all the other evidence you have heard in this case including any evidence to negate or explain any such evidence of flight or whether such evidence was-was a reasonable explanation or not, all of which you may would consider in connection with all the other evidence giving each part of the evidence such weight as you, the jury, feel it's entitled to receive in this particular case."
(R. 2442-45.)
The facts of this case provided sufficient evidence to place before the jury the question whether Henderson resisted arrest or engaged in flight or attempted flight after he struck Deputy Anderson. Deputy Bonham testified that after Henderson struck Deputy Anderson, she got out of her patrol car and ordered Henderson to stop his car and get out. Henderson did not respond immediately, so Deputy Bonham fired two shots at Henderson. Initially he laid his head to the side as if he had been hit by the gunfire, then he grabbed the steering wheel and accelerated several times. Deputy Bonham testified that Henderson floored the accelerator in an attempt to get off of Deputy Anderson's body "and go." (R. 1824.) The resident of the house where the murder occurred testified that after Deputy Bonham had ordered Henderson to stop, he continued to accelerate and he spun the tires forward and then backward but the car was stuck. The resident testified that he wondered at the time why Henderson did not stop accelerating, and said that if someone, especially a police officer, had shot at him and told him to stop, he would have stopped.
The evidence supported the trial court's jury instruction on flight. The evidence of flight was not conclusive, but it was sufficient to put before the jury for its determination of whether the evidence constituted flight. Therefore, the evidence was properly *1012 before the jury, and the trial court's instruction on that evidence was warranted.
No plain error occurred.
III.
Henderson argues that Dr. Glen King, the forensic psychologist he called as an expert witness, gave testimony on cross-examination that was based on facts not in evidence and, therefore, the testimony violated Ex parte Wesley, 575 So.2d 127 (Ala. 1990). Specifically, Henderson argues that the trial court erred when it allowed Dr. King to testify to his opinion that Henderson was not intoxicated or impaired at the time of the offense. Henderson did not raise this objection at trial, so we review it for plain error only.
We set forth the details surrounding Dr. King's testimony and the matters discussed outside the hearing of the jury in order to provide the context for our resolution of the issue now raised.
During Henderson's direct examination of Dr. King concerning Henderson's substance-abuse history, the State objected on grounds that Dr. King's opinions were based on facts not in evidence. Rule 703, Ala. R. Evid. The trial court allowed the State to conduct voir dire examination of Dr. King. During voir dire examination the State asked Dr. King whether he had learned anything about Henderson's substance abuse from sources other than his interview with Henderson. Dr. King testified that he had reviewed the notes from the nurse at the Russell County jail and the toxicology report with the results of the blood test taken approximately six hours after the incident, and he was aware that Henderson had been incarcerated in Georgia on a charge of possessing a controlled substance. Henderson argued to the trial court that Dr. King should be allowed to give his opinion about Henderson's intellectual ability and to testify as he had indicated in the psychological report that, "based on all the information he had," it was likely that Henderson was intoxicated at the time of the offense. (R. 2134.) Henderson told the trial court that he could limit his questions on direct examination to those areas, and the trial court said it would allow the testimony with that limitation. During his testimony on direct examination Dr. King testified that he had indicated in his report that Henderson was likely intoxicated at the time of the offense. He said that, when he wrote the report, he had based that opinion solely on Henderson's statement to him that he had been using drugs at or around the time of the offense. Henderson questioned Dr. King about additional information in the report, including his diagnoses of drug dependency and antisocial personality disorder. Dr. King testified that antisocial-personality disorder is not exacerbated by the use of controlled substances and, rather, that antisocial personality disorder results in the use of illicit substances. Henderson's final question to Dr. King was whether, "through this interview or any other-and/or any other reports or interviews or anything you-that you had at your disposal, did you make any determination whether [Henderson] had ADHD?" (R. 2144.) Dr. King testified that he could say only that he thought Henderson had been treated for ADHD as an adolescent.
On cross-examination, the State asked Dr. King whether, since he had generated the report, he had changed his opinion regarding whether Henderson was intoxicated at the time of the offense, and Dr. King testified that he had. He testified that his opinion was that Henderson was not intoxicated at the time of the offense. The State asked Dr. King why he had changed his opinion, and Dr. King said that he had additional information-the nurse's notes from Henderson's intake *1013 evaluation-though he could not remember whether he had the notes when he wrote the report or whether he came across the notes later. Henderson objected "in terms of what those nurse's notes indicate unless they have that particular witness here." (R. 2145.) The trial court sustained the objection; Henderson did not make a motion to strike. A bench conference was held, and the State argued that it was fundamentally unfair to have permitted Henderson to ask Dr. King what he had learned from the nurse's notes and then deny the State the same opportunity, and the trial court overruled State's objection. The trial judge said he thought the parties had no objection to testimony about the nurse's notes, and Henderson said he did not recall. The trial court determined that the nurse's notes had been provided to Henderson in discovery. The trial court asked Henderson whether he wanted the nurse's notes admitted, and Henderson said that he did not. The trial court told the State to get the nurse to testify and "tie it up." (R. 2147.) Henderson again stated that he would object on hearsay grounds to any testimony based on the nurse's notes unless the nurse testified. The State argued that the nurse's notes were not hearsay because they were made for the purpose of medical treatment or diagnosis. See Rule 803(4), Ala. R. Evid. ("Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not hearsay.).
During further cross-examination the State asked Dr. King whether he had had an opportunity to learn anything about the facts of the case "other than the one question I just asked you, what ... actually happened out there?" (R. 2148.)(Emphasis added.) The "one question" had been the basis for Dr. King's opinion that Henderson was not intoxicated at the time of the offense. (R. 2148.) Dr. King testified that he was not sure how to answer the question and said that he had reviewed witness statements and records, including toxicology reports and reports from the Russell County jail. The prosecutor then clarified his question; he submitted to Dr. King in the form of a hypothetical question a lengthy summary of Deputy Bonham's testimony about Henderson's actions leading up to and during the traffic stop, and he then asked Dr. King for his opinion whether, "[b]ased on that information," Henderson was so intoxicated that he could not form the intent to kill. (R. 2151.) Henderson objected and began to state the grounds for the objection, but the trial court interrupted and asked whether Dr. King could form an opinion. The State then asked Dr. King whether he could form an opinion based on those facts and on others he had learned from the file he had read, and Dr. King testified that he could form an opinion. When the prosecutor asked Dr. King for that opinion, Henderson objected on the ground that the question went to Henderson's mental operation and was one for the jury. The trial court sustained the objection. In response to additional questioning by the State, Dr. King testified that he had not been asked as part of his evaluation to determine whether, because of Henderson's intoxication, he was incapable of forming the intent to commit a particular act. The State then asked: "When you say it's your opinion that the defendant was intoxicated, at what level do you opine that he was actually impaired?" (R. 2151-52.)(Emphasis added.) Dr. King testified without objection that he did not believe Henderson was impaired. When the State asked Dr. King whether it was possible to ingest a controlled substance and not be impaired to the extent it rendered one *1014 incapable of forming intent, Henderson objected on the ground that the matter was a question for the jury, and the trial court sustained the objection.
On redirect examination, Dr. King testified that, after he had completed his evaluation and report, he had changed his opinion and now believed Henderson was not intoxicated at the time of the offense. Dr. King also testified that he had spoken with the prosecutors about his report within a few days before he testified.
Janice McGinnis testified in the State's rebuttal case. She stated that she was a nurse and worked for the Russell County jail. She testified that she had evaluated Henderson when he was brought to the jail as a new inmate on the night of the offense and that she drew a blood sample as part of that evaluation. McGinnis testified that when she asked Henderson about his substance-abuse history he told her that he used only marijuana and alcohol and that he had not used either substance in the two days prior to the offense. Henderson did not mention using methamphetamine. McGinnis testified that she obtained a urine sample from Henderson and that it tested positive for methamphetamine.
Rule 703, Ala. R. Evid., requires that the facts relied on by an expert other than those gained by firsthand knowledge generally must be admitted into evidence. See Ex parte Wesley, 575 So.2d 127, 129 (Ala. 1990) (reversible error occurred where the expert giving an opinion on defendant's mental condition had based the opinion in part on reports and records that were not admitted into evidence). The Wesley Court also stated: "There is no reversible error if the facts upon which the opinion is based are admitted into evidence after the expert has testified." Id. at 129. Henderson's argument, as best we understand it, is that the trial court erred when it allowed Dr. King to testify that Henderson was neither intoxicated nor impaired at the time of the offense because, he says, Dr. King's opinions were based substantially on facts not in evidence. We disagree.
A.
As set forth in detail, above, the State attempted to elicit from Dr. King the reason he changed his opinion after he completed his psychological report about whether Henderson was intoxicated at the time of the offense. Dr. King said he had acquired additional information and began to refer to the nurse's notes when Henderson interrupted him and stated that he objected to the testimony about the nurse's notes unless the nurse testified. The trial court sustained Henderson's hearsay objection, and Dr. King did not testify about any opinions that he had based on the nurse's notes. Because Dr. King did not complete his answer or indicate what part of the nurse's notes might have impacted his opinion or how they might have impacted his opinion, and because the trial court sustained Henderson's objection, it cannot fairly be argued that Dr. King's opinion was based on facts not in evidence.[3] Therefore, there was no violation of Wesley.
Moreover, even if we were to hold that Dr. King's incomplete answer could be interpreted as demonstrating that he relied on the nurse's notes when he changed his opinion, the nurse from the jail who conducted *1015 the medical assessment of Henderson when he was booked at the Russell County jail testified that Henderson told her that he had not used any drugs or alcohol in the days before the offense. Because the nurse testified about the results of her medical assessment and about Henderson's denial of drug use in the days before the offense, any testimony that was based on the nurse's examination would not have been hearsay. Wesley, 575 So.2d at 129.
Finally, even if error occurred as a result of Dr. King's brief and interrupted reference to the nurse's notes with regard to his opinion that Henderson was not intoxicated, it does not rise to the level of plain error. See Ex parte Hodges, 856 So.2d 936, 947-48 (Ala. 2003) (stating that plain error exists only if failure to recognize the error would "seriously affect the fairness or integrity of the judicial proceedings," and that the plain-error doctrine is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result" (internal quotation marks omitted)). Our conclusion that Dr. King's testimony that he had changed his opinion and believed that Henderson was not intoxicated at the time of the offense was not a particularly egregious error affecting Henderson's substantial rights or the outcome of the trial is buttressed by the forensic records and testimony that Henderson tested positive for controlled substances, including methamphetamine that, he said, rendered him unable to form the intent to kill.
B.
Henderson also argues that Wesley was violated when Dr. King testified that he did not believe that Henderson was "impaired" at the time of the offense. The prosecutor asked: "When you say that it's your opinion that the defendant was intoxicated, at what level do you opine that he was actually impaired?" (R. 2151-52.)(Emphasis added.) Henderson did not object to the question, nor did he object or move to strike Dr. King's answer that he did not believe Henderson was impaired. Henderson's allegation that Wesley was violated fails. First, the prosecutor's question was premised on Dr. King's initial opinion that Henderson was, in fact, intoxicated. Second, nothing in the record indicates that Dr. King's testimony was based on any fact not in evidence, and he was not asked to base his opinion on a fact or facts not in evidence. We have considered Dr. King's testimony regarding Henderson's lack of impairment, alone, and as part of Henderson's apparent argument that intoxication and impairment are identical, and we conclude that in neither case does it constitute error and certainly not plain error.
Henderson is not entitled to relief on this claim.
IV.
Henderson argues that the State used its peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The United States Supreme Court in Batson held that it was a violation of the Equal Protection Clause of the United States Constitution for the State to remove a black prospective juror from a black defendant's jury solely based on the juror's race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme Court held that Batson applied even in cases where the defendant's race differed from that of the excluded jurors. In evaluating a Batson claim, a three-step process is followed. Batson, 476 U.S. at 93-94, 106 S.Ct. 1712. First, the defendant must establish a prima facie case to raise the inference of discriminatory intent. Second, if the inference of discriminatory intent is established, the prosecution must offer legitimate, *1016 race-neutral reasons for striking the jurors in question. Third, the trial court must then evaluate the evidence to determine whether the defendant has shown purposeful discrimination in the prosecution's jury strikes.
Before Henderson's trial began, a 7-page juror questionnaire consisting of 53 questions[4] was mailed to each prospective juror for completion before jury selection began. In addition to the information provided in the questionnaires, the parties gained a great deal of information through the extensive voir dire questioning conducted by the trial court and the parties. After excusals and challenges for cause, there remained 36 prospective jurors from which the jury was selected. In addition, prospective alternate jurors were separated into three panels with three veniremembers each; after the jury was struck the trial court allowed each party to exercise one strike per panel, and the remaining veniremember in each panel served as an alternate.
Each party exercised 12 peremptory strikes to select the jury. The State struck six black veniremembers and six white veniremembers. Henderson struck 12 white veniremembers. The jury was composed of 10 white jurors and 2 black jurors. In each of the three panels from which alternate jurors were chosen, the State struck one black veniremember. Henderson struck two white veniremembers and one black veniremember from the panels of prospective alternates. Two white veniremembers and one black veniremember were selected as alternates.
After the jury was struck, the trial court specifically asked whether the parties wanted to bring anything to its attention. The prosecutor asked whether the court was referring to the defense, and the trial court said, "Either one. Any motions?" (R. 1594.) The prosecutor said he had none, and Henderson said that he had no motions either. The trial court stated, "Okay. That's fine. Okay." (R. 1594.) The prosecutor then stated that he would like to put on the record the race-neutral reasons for the strikes, and the trial court allowed it. After the reasons were stated on the record, the trial court said, "Okay. All right," and then asked whether the parties had anything they wanted to bring to the court's attention. (R. 1599.) Henderson said that the defense had nothing to bring to the court's attention.
Henderson argues for the first time on appeal that the State exercised its peremptory strikes in a discriminatory manner when it struck black veniremembers. Although the trial court twice invited Batson motions from either party after the jury was struck, Henderson stated that he had none. Because he declined to make a Batson motion, the trial court had no motion before it and, obviously, Henderson has no adverse ruling from which to appeal. This Court has held that a Batson objection can be waived, see Calhoun v. State, 932 So.2d 923 (Ala. Crim. App. 2005), but, because Henderson has been sentenced to death, we must review this argument for plain error. Rule 45A, Ala. R. App. P.
To find plain error in the Batson context, we first must find that the record raises an inference of purposeful discrimination by the State in the exercise of its peremptory challenges. E.g., Saunders v. State, 10 So.3d 53, 78 (Ala. Crim. App. 2007). Where the record contains no indication of a prima facie case of racial discrimination, there is no plain error. See, e.g., Gobble v. State, 104 So.3d 920, 949 (Ala. Crim. App. 2010). "A defendant makes out a prima facie case of discriminatory *1017 jury selection by 'the totality of the relevant facts' surrounding a prosecutor's conduct during the defendant's trial." Lewis v. State, 24 So.3d 480, 489 (Ala. Crim. App. 2006) (quoting Batson, supra at 94, 106 S.Ct. 1712 ), aff'd, 24 So.3d 540 (Ala. 2009). In Ex parte Branch, 526 So.2d 609, 622-23 (Ala. 1987), the Alabama Supreme Court discussed a number of relevant factors that can be used to establish a prima facie case of racial discrimination: (1) the veniremembers who were peremptorily struck shared only the characteristic of race and were otherwise as heterogeneous as the community as a whole; (2) a pattern of strikes against black veniremembers; (3) the prosecutor's past conduct in using peremptory challenges to strike all blacks from the venire; (4) the type and manner of the prosecutor's questions on voir dire; (5) the type and manner of questions directed to the veniremembers who were peremptorily struck, or the absence of meaningful questions; (6) disparate treatment of members of the jury venire who were similarly situated; (7) disparate examination of black veniremembers and white veniremembers; (8) the State's use of all or most of its strikes against black veniremembers. With these principles in mind, we turn to Henderson's claims.
Henderson argues that a prima facie case of discrimination was established by the totality of the circumstances, including: the State's pattern of peremptory strikes against black veniremembers; the State's disparate questioning of black veniremembers and white veniremembers; and the fact that black veniremembers peremptorily struck by the State were as heterogeneous as the community as a whole and shared no common characteristic except their race. Henderson further argues that the State's proffered race-neutral reasons for striking black veniremembers were pretextual.
In our plain error review of Henderson's claim, we must first determine whether the record supplies an inference of purposeful discrimination by the State in its exercise of peremptory challenges. We have carefully examined the record in light of the factors set out in Branch, and we hold that the record does not raise an inference of racial discrimination.
A.
Henderson argues that the State targeted black veniremembers with its peremptory strikes. In Batson the United States Supreme Court acknowledged that a pattern of strikes against black jurors might give rise to an inference of discrimination. Batson, 476 U.S. at 97, 106 S.Ct. 1712.
We note, first, that Henderson states: "In determining who to strike, the prosecutor created two lists-a list of black veniremembers and a list of white veniremembers." He asserts that the creation of the two lists demonstrates that race was the State's primary consideration in the exercise of its peremptory strikes. (Henderson's brief, at pp. 35-36.) However, Henderson cites nothing in the record demonstrating that the two race-based lists exist, and our review of the record has disclosed none. Although Henderson provides no citation to the alleged lists, he repeatedly refers to "the two lists" in his initial brief and in his reply brief. There being no support for the repeated claim that the State created two lists and that the creation of those lists demonstrates its discriminatory intent, we do not address it further.[5]
*1018 The State struck six black veniremembers and then it struck six white veniremembers. Prospective alternate jurors were divided into three panels, each with three veniremembers, and the State struck one black veniremember from each panel. Although the State exercised its first six strikes against black veniremembers, the State's overall striking pattern does not establish a prima facie case of discrimination. In Lee v. Commissioner, Alabama Department of Corrections, 726 F.3d 1172 (11th Cir. 2013), the United States Court of Appeals for the Eleventh Circuit considered whether the State's use of all of its 21 peremptory strikes and 17 of its 18 strikes for cause against black veniremembers established a Batson violation. The court held that the striking pattern was not a per se violation under Batson. Rather, the court held, the striking pattern was a factor to be considered along with the remaining relevant factors, including the racial composition of the venire and of the jury. The court stated:
" '[T]he number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck.' See United States v. Ochoa-Vasquez, 428 F.3d 1015, 1044 (11th Cir. 2005) (internal quotation marks omitted); see also Cochran v. Herring, 43 F.3d 1404, 1412 (11th Cir. 1995) (stating that 'statistical evidence is merely one factor which the court examines, and it is not necessarily dispositive' in evaluating whether a Batson violation has occurred)."
726 F.3d at 1224.
The State did not exercise its peremptory challenges to dismiss all or almost all the black veniremembers, and two black veniremembers were seated on the jury and a black veniremember was selected as an alternate juror. "Of course, the fact that blacks are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson, but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the defendant's race." United States v. Young-Bey, 893 F.2d 178, 180 (8th Cir. 1990) (internal citation omitted), quoted with approval in Ex parte Thomas, 659 So.2d 3, 7 (Ala. 1994).
The State's pattern of strikes does not establish a prima facie case of discrimination.
B.
Henderson argues that the State "targeted" black veniremembers during individual voir dire and differentially questioned black and white veniremembers. Specifically, he argues that the State "interrogated" more than half of the black veniremembers who had indicated on their questionnaires that they had been arrested, but it questioned less than one-third of the white veniremembers who had been arrested. He also asserts that, when the State questioned veniremembers regarding past arrests, convictions, or negative experiences with law enforcement, the *1019 State asked more white veniremembers than black veniremembers whether those experiences would affect their ability to be fair and impartial. The record as a whole does not support Henderson's argument that the State targeted black veniremembers for questioning during voir dire. The State extensively questioned black veniremembers and white veniremembers alike. Furthermore, the trial court during individual voir dire first questioned the veniremembers with regard to their answers on the questionnaire or during group voir dire that had necessitated individual questioning. The veniremembers' answers to the trial court's questions provided substantial information to the State about the veniremembers before the State asked its questions so that further questioning in many areas would have been redundant. Additionally, the parties had before them a great deal of information the prospective jurors had provided in their questionnaires, and the necessity for some follow-up questioning during individual voir dire was influenced by that information.
Nothing in the record suggests that the State's questions were designed to provoke responses from black veniremembers and not white veniremembers. And, more to the point, nothing in the record shows or even suggests that the State's questions were designed to elicit disqualifying responses from black veniremembers only. Our review of the jury-selection proceedings demonstrates that the State did not treat black veniremembers differently than it treated white veniremembers. Any disparity in the questioning of black and white veniremembers as to the two questions Henderson discusses does not establish an inference of racial discrimination.
Henderson also states that the trial court denied five of the State's challenges for cause against black veniremembers and, he says, the challenges for cause demonstrated that the State made unsuccessful efforts to disproportionately remove black veniremembers. Henderson cites McGahee v. Alabama Department of Corrections, 560 F.3d 1252, 1265 (11th Cir. 2009), as support. The Eleventh Circuit Court of Appeals addressed a Batson issue and stated that this Court, on direct appeal from McGahee's conviction and death sentence, had considered only that the prosecution had used 16 of 22 peremptory strikes against black veniremembers but had failed to consider that all black veniremembers had been removed by the prosecution through challenges for cause and peremptory challenges. The Court stated that there could "be no clearer 'pattern' than the total removal of all African-American jurors from the venire by the State." Id. The Court in McGahee did not discuss the trial court's denial of the prosecution's challenges for cause, and it did not ascribe any meaning to a trial court's denial of challenges for cause. The trial court's denial of the State's challenges for cause does not support an inference of discrimination.
C.
Henderson argues that the black veniremembers the State struck were as heterogenous as the community as a whole and shared no common characteristic except race. Specifically, he argues that the State peremptorily struck male and female black veniremembers and that the veniremembers who were struck were of a broad age range and did not share the same career or marital status. This Court recognized in McCray v. State, 88 So.3d 1, 20 (Ala. Crim. App. 2010), that "there is almost always going to be some variance among prospective jurors who are struck; therefore, this alone does not establish heterogeneity of the struck veniremembers so as to support an inference of discrimination." The relevant question is whether the *1020 struck jurors shared only the common characteristic of race.
Review of the juror questionnaires and the transcript of voir dire examination reflects that many of the black veniremembers struck shared similar characteristics other than race. "Information from a juror questionnaire is entitled to the same weight as information obtained during voir dire examination, and it may provide a valid reason for a peremptory strike." Largin v. State, 233 So.3d 374, 404 (Ala. Crim. App. 2015). Five of the black veniremembers who were peremptorily struck by the State responded affirmatively to question 33 on the questionnaire: "Have you, a close relative, or a close friend even been convicted of a crime?" Four of the black veniremembers who were peremptorily struck by the State disclosed on their juror questionnaires that they had been arrested. The record discloses that the black veniremembers who were struck by the State in this case were not heterogeneous in all respects but race. Therefore, this factor does not support an inference of discrimination.
Based on our thorough review of the jury-selection process and the juror questionnaires, we find no inference that the State engaged in purposeful discrimination toward black veniremembers; therefore, we find no plain error.
Henderson argues that, because the State volunteered its reasons for striking black veniremembers, this Court is obligated to review those reasons under a Batson inquiry. He cites Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), for its statement that "once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot" and argues that Hernandez and Alabama cases relying on that rule of law, e.g., Dallas v. State, 711 So.2d 1101 (Ala. Crim. App. 1997), require this Court to review the State's reasons for its strikes. This case is not controlled by Hernandez, Dallas, and cases in that same procedural posture, however, because this case distinguishable. Unlike the defendants in those cases, Henderson did not make a Batson motion, and the trial court did not "rule[ ] on the ultimate question of intentional discrimination." Therefore, the preliminary question of whether the record raises an inference that the State engaged in purposeful discrimination and struck black veniremembers on the basis of race necessarily had to be addressed in this case to determine whether plain error occurred. Having found no inference of discrimination in the record pursuant to our plain-error review, consideration of the State's unsolicited proffer of reasons for its strikes is beyond the scope of that review, and it is both unwarranted and unnecessary.
Citing Ex parte Floyd, 190 So.3d 972 (Ala. 2012), aff'd on second return to remand, 190 So.3d 990 (Ala.Crim.App.2012), vacated on other grounds and remanded, --- U.S. ----, 136 S. Ct. 2484, 195 L.Ed.2d 820 (2016), Henderson argues that this Court is bound to "protect the record from race discrimination during jury selection, even where there is no objection from defense counsel." (Henderson's reply brief, at p. 19.) We understand Henderson to be citing Floyd as support for his argument that this Court must review the State's volunteered reasons for its peremptory strikes of black veniremembers. Floyd is not controlling here. Floyd held, in relevant part, that, following remand from this Court in Floyd v. State, 190 So.3d 940 (Ala. Crim. App. 2008), that an inference of discrimination existed in the record, and after the trial court held a hearing pursuant *1021 to Batson and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the trial court erred because it had failed to enter specific findings concerning the State's reasons for striking blacks and women from the venire. This case is in an entirely different procedural posture in that there has been no finding of an inference of discrimination, no Batson hearing, and no rulings from the trial court to review. Floyd does not require this Court to review the State's volunteered reasons for its peremptory strikes.
There being no plain error as to this issue, Henderson is not entitled to relief.
V.
Henderson argues that his Eighth and Fourteenth Amendment rights were violated during the final sentencing hearing held before only the trial court because, he says, the trial court erroneously considered inflammatory victim-impact testimony from Deputy Anderson's family members and from the Lee County sheriff. Specifically, he asserts that the trial court erroneously considered the witnesses' recommendation that Henderson be sentenced to death and that it considered their characterization of Henderson and of the crime. Henderson did not object during the hearing when the testimony was given, nor did he object on these grounds after the trial court entered its written sentencing order. We review this issue for plain error, and we find none.
Henderson correctly states that in the final sentencing order the trial court referred to the witnesses' recommendation that Henderson receive "the maximum punishment allowable under the law" or the death sentence. (C. 473-74). However, the trial court referred to the statements in the section of the sentencing order addressing its override of the jury's recommended sentence of life without the possibility of parole. The trial court stated that Ex parte Carroll, 852 So.2d 833 (Ala. 2002), and subsequent cases required the trial court to address the factors that should be considered in determining the weight to afford the jury's recommendation. The trial court explained the limited purpose for which the witnesses' statements were considered:
" Ala. Code § 15-23-74 (1975) states, 'The victim has the right to present evidence, an impact statement, or information that concerns the criminal offense or the sentence during any pre-sentencing, sentencing, or restitution proceeding.' The Court will consider the family's unsworn statements only to show that the family opposed leniency."
Id. n.26 (emphasis added). See also id. n.27 (identifying the witnesses who had testified). The trial court further stated:
"In Carroll, the victim's family recommended that Carroll be sentenced to life without parole. At the sentencing hearing in this case, several members of Anderson's family requested the maximum penalty allowed by law or that Henderson receive the death penalty. Their recommendation against leniency weighs in favor of judicial override in comparison to Carroll."
Id. at 474 (footnotes omitted).
Lockhart v. State, 163 So.3d 1088 (Ala. Crim. App. 2013), presented identical circumstances, and, but for a few minor differences that did not affect the substance of the order, the language in Lockhart's final sentencing order was identical to the final sentencing order in this case. We found no plain error in Lockhart, and we explained:
"The Alabama Supreme Court has stated:
" 'In Booth v. Maryland, 482 U.S. 496, 502[, 107 S.Ct. 2529, 96 L.Ed.2d 440] (1987), the United States Supreme Court held that a defendant's Eighth *1022 Amendment rights were violated by the sentencing authority's consideration of any victim-impact evidence. In Payne v. Tennessee, 501 U.S. 808[, 111 S.Ct. 2597, 115 L.Ed.2d 720] (1991), the United States Supreme Court partially overruled Booth to allow the sentencing authority to consider evidence of the effect of the victim's death upon family and friends. Payne, 501 U.S. at 830 n. 2 ("Our holding today is limited to the holdings of [ Booth ] ... that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing.").'
" Ex parte Washington, 106 So.3d 441, 445 (Ala. 2011).
"The Alabama Supreme Court has further stated that a trial court errs if it 'consider[s] the portions of the victim impact statements wherein the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment.' Ex parte McWilliams, 640 So.2d 1015, 1017 (Ala. 1993). However, in Ex parte Land, 678 So.2d 224 (Ala. 1996), the Alabama Supreme Court found that it was not plain error for the trial court when considering sentencing, to read letters from members of the victim's family and from members of the defendant's family, some of which expressed opinions as to the appropriate punishment, because those letters were read only by the trial judge and only 'out of a respect for the families and for the limited purpose of possibly establishing a mitigating factor.... 'Land, 678 So.2d at 237.
"Likewise, in the present case, the statements of the victim's relatives were not presented to the jury, and the trial court explicitly stated that it considered the statements only for the limited purpose of determining whether the victim's family opposed leniency, which was a factor that was considered in Carroll to assign weight to the mitigating factor of the jury's recommendation. Because the trial court carefully limited the purpose for which he considered the statements, Lockhart's substantial rights were not adversely affected; thus, the trial court did not commit plain error."
Lockhart, 163 So.3d at 1138-39.
Our analysis in Lockhart applies equally in this case. And, as in Lockhart, we hold that no plain error occurred. Henderson is not entitled to relief on this claim.
VI.
Henderson argues that, in overriding the jury's recommended sentence, the trial court failed to abide by the requirements set out in Ex parte Carroll, 852 So.2d 833 (Ala. 2002), and Ex parte Tomlin, 909 So.2d 283 (Ala. 2003). Henderson did not raise this argument in the trial court, so our review is for plain error only.
Section 13A-5-47(e), Ala. Code 1975, provides that, although the jury recommends the sentence it believes the trial court should impose, the trial court determines the sentence and may override the jury's recommendation. The statute states:
"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
*1023 In Carroll, the Alabama Supreme Court reviewed the trial court's override of a jury's recommendation of life imprisonment without the possibility of parole. The Court found error in the trial court's use of Carroll's juvenile record as the basis for giving little or no weight to the mitigating circumstance that Carroll had no significant history of prior criminal activity. Carroll, 852 So.2d at 835-36. The Supreme Court then found that Carroll's lack of a significant criminal history, the recommendation by the victim's family that Carroll's life be spared, and the jury's 10-to-2 recommendation warranted of a sentence of life imprisonment. The Supreme Court determined that the jury's recommendation of a life-without-parole sentence is to be treated as a mitigating circumstance. Carroll, 852 So.2d at 836. The Court further stated:
"The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the 'triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance."
Id.
In Tomlin, the trial court found one aggravating circumstance and overrode a unanimously recommended sentence of life imprisonment without the possibility of parole. The Alabama Supreme stated:
" '[T]he death penalty should be carried out only after this Court has found it appropriate to do so by independently weighing the aggravating and mitigating circumstances.' Ex parte Hays, 518 So.2d 768, 780 (Ala. 1986) (opinion on rehearing). Therefore, while the trial court, acting without the guidance offered by Carroll, gave 'serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,' we are compelled to treat 'the jury's recommendation as a mitigating circumstance. Indeed, we must give that mitigating circumstance great weight.
" 'The weight to be given [a jury's recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.' [ Ex parte ] Carroll, 852 So.2d [833] at 836 [ (Ala. 2002) ]. In Carroll, we found that a jury's 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated 'overwhelming support' of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more 'overwhelming support' of such a sentence and, therefore, must be afforded great weight.
"....
" '[T]he jury's recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.' Carroll, 852 So.2d at 836. Here, the trial court overrode the jury's recommendation, because '[t]he other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people and [was] sentenced to death.' Although the jury was not aware of Daniels's sentence, his sentence cannot properly be *1024 used to undermine a mitigating circumstance."
Tomlin, 909 So.2d at 286-87.
With these principles in mind, we consider Henderson's arguments.
A.
Henderson first argues that the trial court erred by finding that the absence of the factors set out in Carroll required overriding the jury's recommended sentence. The record does not support Henderson's argument.
The trial court prepared an extensive, detailed, and thorough sentencing order. After setting out the procedural history of the case and the evidence presented at trial, the trial court discussed its fact-findings regarding each statutory aggravating circumstance, each statutory mitigating circumstance, and the nonstatutory mitigating circumstances. In the next section of the sentencing order, the trial court addressed its reasons for overriding the jury's recommendation as to sentence. The trial court first stated:
" Ex parte Carroll, 852 So.2d 833 (Ala. 2002), and the cases decided subsequently, requires that this Court address its reasons for overriding the jury's sentencing recommendation. Carroll gives factors a trial court should consider in determining the weight to afford to a jury's sentencing recommendation:
" 'The weight to be given [to] that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the "triggerman" or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.'
"Therefore, the Court will note the factors listed in Carroll and the ways this case differs in those respects."
(C. 472-73.)(Footnote omitted.)
The trial court then discussed each of the factors listed in Carroll, and compared the circumstances in Henderson's case relative to those in Carroll. For example, the trial court stated:
"A. The number of jurors recommending life without parole.
"In Carroll, ten jurors recommended life without parole. Here, nine jurors recommended that Henderson be sentenced to life without parole and three jurors recommended death. Therefore, the number of jurors recommending life without parole is given slightly less weight when compared to Carroll."
(C. 473.)
The trial court then addressed the second and third factors mentioned in Carroll-conflicting evidence concerning the identity of any triggerman, and any recommendation of leniency by the victim's family. The trial court found that there was no conflicting evidence as to the identity of a triggerman because there had been no dispute that Henderson was driving the car when Deputy Anderson was killed and that "this factor weighs in favor of judicial override in comparison to Carroll." (C. 473.) The trial court then considered the Carroll factor noting the recommendation by the deceased's family that Carroll be sentenced to life imprisonment without the possibility of parole and stated that several members of Deputy Anderson's family requested the maximum penalty allowed by law or a death sentence and found that the family's "recommendation against leniency weighs in favor of judicial override in comparison *1025 to Carroll." (C. 474.) The trial court then considered the remaining factors set forth in Carroll: additional facts of the crime known to the jury, such as not killing witnesses; and additional facts unknown to the jury, such as testimony from the final sentencing hearing and the presentence investigation report.
Henderson's argument that the trial court failed to comply with Carroll and Tomlin based on its assessment of the factors set out in Carroll is without merit.
B.
Henderson argues that, in overriding the jury's sentencing recommendation, the trial court relied primarily and improperly on evidence unknown to the jury-the statement and testimony of Alexandria Barfield, who said that, some time before Henderson killed Deputy Anderson, Henderson had told her that he would shoot any policeman who pulled him over. Henderson argues that, according to Carroll, a trial court can use information that had not been available to a jury only to undermine a mitigating circumstance. Therefore, he says, the trial court's reliance on that evidence was improper because the evidence did not undermine a mitigating circumstance.
Henderson's interpretation of Carroll is not supported by Alabama caselaw.
"The Supreme Court's holding in Carroll did not purport to be an exhaustive list of what the court could consider when sentencing a defendant to death after a jury has recommended a sentence of life imprisonment without the possibility of parole. A defendant in a capital-murder case is entitled to an individualized sentencing determination. The circuit court's order was consistent with the provisions of § 13A-5-47(e), Ala. Code 1975, and with our holding in Harris v. State, 2 So.3d 880 (Ala. Crim. App. 2008).
" Section 13A-5-47(e), states, in pertinent part:
" 'In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict....'
"(Emphasis added.)
"In Harris, we upheld the circuit court's override of the jury's recommendation of life imprisonment without the possibility of parole after the court indicated in its order that it considered evidence outside the record as it related to the aggravating circumstance that two or more persons were killed pursuant to one scheme."
Scott v. State, 163 So.3d 389, 467-68 (Ala. Crim. App. 2012). See also Woodward v. State, 123 So.3d 989 (Ala. Crim. App. 2011).
We note, first, that the record provides no support for Henderson's assertion that consideration of Barfield's testimony was the trial court's "principal justification" for overriding the jury's verdict. (Henderson's brief, at p. 62.) The court stated that it found Barfield's testimony "credible." (C. 477.) The trial court also discussed and considered evidence from four additional sources that were unknown to the jury: the presentence investigation report; Henderson's testimony at the hearing; testimony about Henderson's prior conviction for aggravated assault; and recordings of telephone conversations Henderson had while he was incarcerated in the Russell County jail regarding "Alex" and Ronnie Griffin-two people Henderson knew might be called to testify against him-and specifically telling one of the callers that *1026 "someone" should talk to Alex.[6] Nothing in the trial court's sentencing order indicates that it gave more or less weight to any one of those sources. (C. 474-77.)
The trial court's override of the jury's verdict was based on far more than the information provided by Barfield during the final sentencing hearing that the jury did not hear. The trial court did not violate Carroll when it considered Barfield's testimony, and Henderson is not entitled to relief on this claim of error.
VII.
Henderson argues that the trial court relied on improper evidence and excluded relevant mitigating evidence from its sentencing consideration. We review this argument for plain error because Henderson did not raise it in the trial court.
This Court stated in Largin v. State, 233 So.3d 374, 424 (Ala. Crim. App. 2015) :
" Section 13A-5-45(g), Ala. Code 1975, provides that, '[w]hen the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.' The United States Supreme Court in Lockett v. Ohio, 438 U.S. 586[, 98 S.Ct. 2954, 57 L.Ed.2d 973] (1978), held that a circuit court must consider all evidence offered in mitigation when determining a capital defendant's sentence. However, a defendant's proffer of evidence in support of a mitigating circumstance does not require the trial court to find that the mitigating circumstance exists. Rather, the trial court, after considering all proffered mitigating evidence, has the discretion to determine whether a particular mitigating circumstance has been proven. E.g., Carroll v. State, [Ms. CR-12-0599, Aug. 14, 2015] --- So. 3d ----, ---- (Ala. Crim. App. 2015) ; Albarran v. State, 96 So.3d 131, 213 (Ala. Crim. App. 2011)."
A.
Henderson contends that the trial court erred when it failed to find as a statutory mitigating circumstance that his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired at the time of the crime. § 13A-5-51(6), Ala. Code 1975. He argues, specifically, that, in failing to find this mitigating circumstance, the trial court credited Dr. King's opinion that Henderson had no mental illness at the time of the offense that would have rendered him unable to understand the nature of his actions or the wrongfulness of those actions. Henderson argues that the record established that he had methamphetamine in his system at the time of the offense and that his level of intoxication may have substantially impaired his ability to conform his conduct to the requirements of the law. (Henderson's brief, at p. 64.) He further argues that Dr. King testified that Henderson was of borderline intelligence and that he exercised poor judgment. We review this issue for plain error because Henderson did not raise it in the trial court.
The trial court considered the evidence proffered by the parties as to this mitigating circumstance and stated:
"Dr. King evaluated the defendant and reported that Henderson had no mental illness or defect at the time of the offense that would render him incapable of *1027 understanding the nature and quality of his actions or the wrongfulness of his acts. The Court finds that this mitigating circumstance does not exist."
(C. 466.)
Dr. King testified he had completed a written report after he evaluated Henderson, and that he indicated in that report that Henderson's judgment was poor and that his intellectual ability was likely borderline. Dr. King further testified that his evaluation of Henderson led him to three diagnoses: addiction to methamphetamine, addiction to marijuana, and antisocial-personality disorder. He described a personality disorder as follows:
"A personality disorder is a pervasive disorder of personality or character flaw that's usually present from some time early in an individual's life, starting before age 18, in this case marked by continued difficulties with the law, not-not concerned about going along with normal mores and moral circumstances of life. Problems with authority figures. Difficulties in adjustment in jobs. Marital difficulties. Problems adjusting to military and things of that nature. Usually there is a history of run-ins with the law, including incarcerations."
(R. 2142-43.)
Although Henderson argued that the foregoing evidence supported a finding of the § 13A-5-51(6) mitigating circumstance, the trial court, in a proper exercise of its discretion, determined that the evidence did not establish that, at the time of the murder, Henderson lacked the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. E.g., Carroll v. State, 215 So. 3d 1135, ---- (Ala. Crim. App. 2015) (the trial court, after considering all proffered mitigating evidence, has the discretion to determine whether a particular mitigating circumstance has been proven). The record does not support Henderson's argument that the trial court required him to "satisfy a greater burden of proof than required by Alabama law to establish this mitigating circumstance." (Henderson's brief, at p. 66.)
Therefore, no plain error occurred as to the trial court's finding that the § 13A-5-49(6) mitigating circumstance did not exist.
B.
Henderson next argues that the trial court erred when it failed to find the existence of certain nonstatutory mitigating circumstances: his long history of substance abuse; his struggle with ADHD; and his poor academic performance. He states that the trial court "acknowledged the ample testimony and evidence supporting those facts" but that the court declined to consider them to be mitigating circumstances. (Henderson's brief, at p. 66.) Because Henderson failed to raise this argument at trial, we review only for plain error.
Henderson accurately summarizes the trial court's sentencing order-the trial court considered the proffered evidence and determined that it did not constitute mitigation. The trial court committed no error, much less plain error, in its consideration of Henderson's proffered mitigation evidence. See Largin v. State, 233 So.3d 374, ---- (Ala. Crim. App. 2015), and cases cited therein.
C.
Henderson argues that the trial court erred when it considered his history of traffic violations to rebut the § 13-5-51(1), Ala. Code 1975, statutory mitigating circumstance-that Henderson did not have a significant history of prior criminal activity. He raises this argument for the first time in this Court, so we review for plain error.
*1028 The trial court considered the evidence Henderson had proffered as support for this mitigating circumstance, and it found that the State had rebutted the evidence. The evidence established that Henderson had two prior felonies-possession of methamphetamine and aggravated assault. Those convictions were sufficient evidence upon which the trial court could base its determination that the mitigating circumstance did not exist. Even if the trial court considered Henderson's traffic convictions in its evaluation of whether the statutory mitigating circumstance existed, any error in doing so would not have risen to the level of plain error. E.g., Johnson v. State, 823 So.2d 1, 55 (Ala. Crim. App. 2001). Davis v. State, 718 So.2d 1148 (Ala. Crim. App. 1995), aff'd, 718 So.2d 1166 (Ala. 1998).
Furthermore, the trial court's consideration of the traffic convictions was not improper. First, Henderson incorrectly states that the trial court considered traffic offenses that did not result in convictions. (Henderson's brief, at p. 68.) The trial court explicitly stated that it had considered only Henderson's adult criminal record, and that it had excluded from consideration any traffic offenses that had not resulted in a conviction or a plea of guilty and those that were still pending. (C. 463 n.19.) "Misdemeanor convictions may be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity." Johnson, 823 So.2d at 54.
No plain error exists as to the trial court's consideration of the evidence or as to its findings based on that evidence. Henderson is not entitled to relief.
VIII.
Henderson next argues that the trial court erred when it failed to sua sponte instruct the jury on the weight to be given to the testimony of the experts he called during the defense's case. Henderson raises this claim for the first time, so we review for plain error.
Henderson cites Weeks v. State, 580 So.2d 79 (Ala. Crim. App. 1991), in support of his claim. Weeks argued that the trial court refused to give his proposed charge on expert testimony:
" 'In considering the opinion of the expert witness, which has been admitted in this case, you are instructed to consider the expert testimony in the same manner as you do any other testimony and give it such weight and [sic] as you may believe it to be entitled when considered with all the other evidence in the case. Expert testimony is given for the purpose of enlightening you and not for the purpose of controlling your judgment.' "
Weeks, 580 So.2d at 80. This Court reversed Weeks's conviction and held that the substance of the proposed charge was not substantially and fairly covered in the trial court's general charge on how the jury should weigh the credibility of witnesses in general.
Weeks does not mandate a reversal because Henderson's case is in a different procedural posture. In Weeks we conducted a review for preserved error, and here we review for plain error. Weeks does not hold that the failure to sua sponte give an instruction on the weight to be afforded expert testimony is plain error.[7] The Alabama *1029 Supreme Court has held that the failure to sua sponte give an instruction on the weight to afford an expert's testimony was not prejudicial error. Calloway v. Lemley, 382 So.2d 540, 542-43 (Ala. 1980) (the instruction on the weight to give expert testimony "would have been appropriate to give, but it was not prejudicial error for the trial judge to refuse it, especially since the plaintiff did not request the court to instruct the jury on the weight to accord an expert's testimony"). The Alabama Supreme Court noted in Calloway that the trial court had instructed the jury that it was to weigh the credibility of all witnesses.
Henderson states: "Although the court gave a general charge on determining the credibility of lay witnesses, the charge did not remedy the omitted instruction on assessing expert witnesses." (Henderson' brief, at p. 71. (Emphasis added, internal record citation omitted.) Henderson incorrectly states that the trial court's instruction was limited to lay witnesses. The trial court charged the jury as follows:
"You are the sole judges as to the weight that should be given to all of the testimony in the case. You should take the testimony of the witnesses together with all proper and reasonable inferences therefrom, apply your common sense, and in an honest and impartial way determine what you believe to be the truth. You should weigh all of the evidence and reconcile it, if possible. But if it cannot be reconciled you ought to take that evidence which you think is worthy of credit and give it just such weight as you think it's entitled.
"You may take into consideration any interest any witness might have in the outcome of the case. If you believe that any material part of the evidence of any witness is willfully false, you may disregard all the testimony of that witness."
(R. 2410-12.)(Emphasis added.)
The trial court was not required to sua sponte give the jury an additional instruction that specifically addressed the credibility of expert testimony. The trial court's failure to give an instruction on the evaluation of expert testimony in the absence of a request for that instruction does not rise to the level of plain error.
IX.
Henderson argues that his conviction and sentence should be reversed because, he says, the State on cross-examination attempted to elicit from his expert, Dr. King, his opinion about whether Henderson had the specific intent to kill at the time of the offense.
The State on cross-examination presented to Dr. King a hypothetical question based substantially on the facts of this case, then asked him to state his opinion about whether Henderson was so intoxicated as to have been unable to form the intent to kill. Henderson objected on the ground that the issue presented a jury question, and the trial court sustained the objection. The State later asked Dr. King whether it was possible to ingest a controlled substance and not be so impaired as to be incapable of forming some intent. Henderson objected on the ground that the issue was a jury question, and the trial court sustained the objection. Henderson argues for the first time on appeal that error occurred merely because the State asked the expert questions about the intent to kill.
Henderson cites cases in which this Court held that reversible error occurred where a trial court permitted expert testimony *1030 regarding a defendant's intent to kill. However, he cites no legal authority for the proposition now raised-that reversal is due based on the State's question about the formation of the intent to kill-when the trial court sustained defense counsel's objection before the expert witness answered the question. Henderson's bare allegation of error fails to satisfy the requirements of Rule 28(a)(10), Ala. R. App. P., which requires the argument section of an appellant's brief to set out "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."
Even though Henderson failed to raise this argument at trial and even though he failed to cite any legal authority to support the argument on appeal, we review for plain error. See Shanklin v. State, 187 So.3d 734 (Ala. Crim. App. 2014) (noting that, in capital-murder cases, claims in briefs not in compliance with Rule 28(a)(10) are reviewed for plain error). We find no plain error. By sustaining Henderson's objections, the trial court precluded any testimony from Dr. King regarding his opinion about specific intent. Furthermore, the trial court instructed the jurors repeatedly that they were the sole judges of the facts in the case and that they were to determine the facts based, in part, on witness testimony. We presume that the jury follows the trial court's instructions. E.g., Thompson v. State, 153 So.3d 84 (Ala. Crim. App. 2012).
Nothing in the record even suggests that any of Henderson's substantial rights were affected. Rule 45A, Ala. R. App. P. Cf. Johnson v. State, 120 So.3d 1130, 1190-91 (Ala. Crim. App. 2009) (holding, where witness's volunteered statement during State's questioning was nonresponsive and the trial court sustained defense counsel's objection and instructed the witness to only answer the question that the remark did not rise to the level of plain error and did not adversely affect the appellant's substantial rights).
No plain error occurred, and Henderson is not entitled to relief on this claim.
X.
Henderson argues that several errors resulted from the State's introduction into evidence three photographs of a blade found between the driver's seat and the driver's door of Henderson's car. He argues that the photographs were unrelated to Deputy Anderson's death and were inadmissible; that the prosecutor projected the images during closing argument at the guilt phase and improperly argued that the presence of the blade in that location indicated that Henderson also intended to kill Deputy Bonham and that argument served only to establish Henderson's bad character; and that the trial court erred when it considered the blade in affording little weight to his proffered mitigating circumstance that he had remorse for the crime. We review Henderson's claims for plain error because he did not first raise them in the trial court. We find no plain error.
A.
The blade was found during the investigation of the crime scene. Photographs of the blade were displayed, without objection, along with many other photographs related to the investigation. Evidence as to the scene of a crime and objects found at the crime scene are admissible and relevant. E.g., Whatley v. State, 146 So.3d 437 (Ala. Crim. App. 2010) (opinion on return to remand). There is no support for Henderson's bare allegation that the photographs were offered to show his bad character. No plain error occurred as a result of the admission of the photographs of the knife.
*1031 B.
During closing argument the State detailed the evidence it had presented, and it displayed the photographs of the knife while it described Henderson's actions after he had run over Deputy Anderson. The State summarized Deputy Bonham's testimony that, after she fired two shots, she thought she had hit Henderson because he slumped against the driver's window, but he started moving again and she leveled her gun at him told him to get out of the car. The prosecutor questioned why Henderson would possibly want to "play possum" and act like he had been struck by one of the bullets and whether Henderson was trying to get Deputy Bonham to move closer to his car because he had not dealt with her yet. Henderson did not object to the prosecutor's argument, but he argues now that the argument was made only to establish his bad character.
Alabama law clearly holds that, during closing argument, the parties have a right to present their reasonable impressions from the evidence and to argue legitimate inferences from the evidence. E.g., Largin v. State, 233 So.3d 374 (Ala. Crim. App. 2015), and cases cited therein. The photographs of the knife were in evidence and Deputy Bonham had testified that Henderson had slumped against the window after she had fired shots at him. The prosecutor was permitted to comment on the evidence and on the reasonable inference that, perhaps, by "playing possum" and pretending to be shot and incapacitated, Henderson might have been attempting to get Deputy Bonham to walk up to the car because he had a blade next to the driver's door and he wanted to harm her. The prosecutor's comments, although they referred to Henderson's actions and made unfavorable inferences from it, were not improper. They were based on the evidence and on reasonable inferences from the evidence. See, e.g., Albarran v. State, 96 So.3d 131 (Ala. Crim. App. 2011). No plain error occurred.
C.
Henderson argues that the trial court erred when, in considering the proffered nonstatutory mitigating circumstance of remorse, the trial court gave it little or no weight because, he says, the trial court impermissibly considered the erroneously admitted evidence of bad character in making that determination. Again, Henderson did not raise this argument in the trial court, so we review for plain error. There is no plain error here.
First, as discussed, above, the photographs of the blade and testimony about the blade were properly admitted. Therefore, the trial court's reference to the evidence from the crime scene did not constitute consideration of bad-character evidence. Furthermore, the trial court found that Henderson's expression of remorse at the crime scene and during his testimony at the final sentencing hearing constituted a nonstatutory mitigating circumstance. The court explained the many reasons it afforded the circumstance little or no weight:
"[T]he Court also bears in mind the statements and demeanor of Alexandria Barfield, specifically that Henderson had threatened harm towards law enforcement prior to the date of the offense; that on the day of the offense, an investigator found a large weapon in Henderson's car accessible from the driver's seat; phone conversations taped days prior to the July 27th, 2012, sentencing hearing from the Russell County Jail, in which Henderson acknowledged that Griffin and Barfield might appear to testify against him and specifically indicating that someone should talk to Barfield; and that Henderson has admitted *1032 to lying under oath on at least one occasion. The Court notes in particular that at one point during Henderson's testimony, he callously compared Anderson's death to the collision of two bees he saw on television. While the Court recognizes that the defendant may be remorseful on some level, it affords this mitigating circumstance very little, if any, weight."
(C. 468.)(Footnote omitted.)
The record does not support any of Henderson's claims of error with regard to the evidence of the blade found next to the driver's door. Finding no plain error, we conclude that Henderson is not entitled to relief.
XI.
Henderson argues that the trial court erred when it permitted Janice McGinnis, the nurse who conducted Henderson's intake assessment at the Russell County jail to testify about statements he made during her intake assessment because, he says, "Russell County officials" questioned him while he was being processed into the county jail. (Henderson's brief, at p. 78.) To the extent Henderson implies that he was questioned by members of law enforcement, he mischaracterizes the record. McGinnis testified, in relevant part, that during her routine intake evaluation of Henderson as a new inmate, Henderson told her that he used only alcohol and marijuana, and that he had used neither in the two days before the offense. Henderson had earlier invoked his right to counsel and, he now argues, because law-enforcement officers were present when the nurse asked the assessment questions, those questions were part of the ongoing criminal investigation. Therefore, he says, the statements should have been excluded, and he cites Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), as support for his argument.
In Edwards, the Supreme Court stated that, after an accused clearly invokes his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
Henderson requested that the trial court require the State to make a proffer of McGinnis's expected testimony outside the hearing of the jury, and the trial court granted the request. McGinnis testified, in relevant part, that she was employed at the Russell County jail and that her contact with Henderson came as a result of her job to evaluate him as a new inmate; that the evaluation took place in the infirmary at the Russell County jail; that she asked Henderson questions during the evaluation and that none of the law-enforcement officers who were also in the room directed her to ask any of those questions, including when he last consumed drugs or alcohol; and that her questions to Henderson related to his medical history and had nothing to do with the case. McGinnis testified that Henderson told her that he only used marijuana and alcohol and that he had ingested neither in the two days before the incident.
McGinnis further testified:
"I do this with all my inmates because I want an evaluation on how they are doing. I mean, I knew that he was-had been-had just first come to jail, and that, you know, you want to see how afraid they are, what their suicide status is, what their drug status is, psychiatric status, so that you can take better care of them."
*1033 (R. 2249.) She also stated, "These are the same questions I ask every inmate that I do an assessment on." (R. 2250.)
McGinnis testified that it was customary for an inmate to be shackled or handcuffed during the intake assessment, and that Henderson probably was wearing restraints during the assessment; that a law-enforcement officer is always present with the nurse; that one clerk and three law-enforcement officers were present during Henderson's intake evaluation; and that Henderson's answers to her questions appeared to be voluntary.
Henderson argued at trial that McGinnis should not be permitted to testify because, he said, he had inferred during the intake assessment that the nurse was acting under the direction of law-enforcement officers and, therefore, the questioning was improper because he had invoked his Miranda rights several hours earlier. The trial court asked Henderson whether he had any caselaw holding that Miranda applies to a nurse's questions during an intake evaluation, and Henderson said that he did not. The trial court stated that it appeared that the nurse was only asking questions that she typically asked any inmate during the intake evaluation process, and it determined that the nurse would be allowed to testify. The trial court acknowledged that the issue was unique, and told the parties it would be glad to review any relevant caselaw they might find. The parties provided none. The nurse testified before the jury, in relevant part, that Henderson had told her that he used only marijuana and alcohol and that he had not used either of those substances in the two days before the incident.
Henderson argues that the trial court erred when it permitted the nurse to testify about the evaluation because, he says, the nurse's questions were made as "part of an ongoing investigation by law enforcement." (Henderson's brief, at p. 81.) He further argues that, because McGinnis's questions were not part of a routine booking process, the State was required to prove by a preponderance of the evidence that his statement was voluntary and that it failed to do so. The trial court determined that the nurse's questions were part of the routine medical-intake process, and we agree.
The United States Supreme Court in Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody ) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Emphasis added; footnotes omitted.) The United States Supreme Court held in Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), that questions asked as part of the routine booking procedure do not fall within the protections of Miranda. Much like conducting a routine booking procedure, McGinnis was performing the intake evaluation she conducted on every newly admitted inmate, and the questions she asked Henderson were no different than those she asked every new inmate. McGinnis testified that law-enforcement officers did not direct her to ask any questions. She said that no one threatened, coerced, or offered any hope of reward to Henderson to make him answer her questions. Furthermore, McGinnis testified that a law-enforcement officer is present during each intake assessment at the jail. If the presence of a law-enforcement officer during an intake assessment of an inmate who invoked his Miranda rights, alone, is considered a violation of Miranda, no information or evidence obtained *1034 from an intake evaluation would be admissible in any case.
Because the trial court correctly determined that McGinnis's questions were not part of the criminal investigation, proof of a Miranda predicate was not required, and, more to the point, Edwards was not violated because Henderson was not subjected to interrogation after he invoked his Miranda rights.
The trial court committed no error when it allowed McGinnis to testify, and Henderson is not entitled to any relief.
XII.
Henderson argues that the trial court erred when it refused to excuse veniremember C.S. for cause.
During voir dire questioning C.S. stated that he had known Deputy Anderson because the deputy had attended high school with C.S.'s daughters. C.S. said that the three teenagers had worked on school projects together a couple of times, but they had not worked on the projects at C.S.'s house. He said that he last saw Deputy Anderson when the deputy was working the gates at a ball field. When the trial court asked C.S. whether he could sit on the jury and render a fair and impartial verdict even though he had known Deputy Anderson, C.S. replied, "Yes, sir. The law-the law says that everybody is innocent until the facts prove otherwise." (R. 1116.) Henderson challenged C.S. for cause based on his acquaintance with Deputy Anderson.
"A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala. Crim. App. 1993). For that reason, we give great deference to a trial judge's ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala. Crim. App. 2001) [reversed on other grounds, 906 So.2d 277 (Ala. 2004) ]." Turner v. State, 924 So.2d 737, 754 (Ala. Crim. App. 2002).
"To justify a challenge for cause, there must be a proper statutory ground or ' "some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." ' Clark v. State, 621 So.2d 309, 321 (Ala. Crim. App. 1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala. Crim. App. 1983) ). This Court has held that 'once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala. 1995). A juror 'need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So.2d 55, 61 (Ala. Crim. App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror ' "must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused" '; ' "[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render." ' Oryang v. State, 642 So.2d 979, 987 (Ala. Crim. App. 1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala. Crim. App. 1989) )."
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala. 1998). "The test for determining whether a juror who is acquainted with *1035 someone involved in the litigation should be excused for cause is whether the juror's acquaintance with that person would result in 'probable prejudice.' Vaughn v. Griffith, 565 So.2d 75, 77 (Ala. 1990)." Ford v. State, 628 So.2d 1068, 1070 (Ala. Crim. App. 1993).
Furthermore, in Evans v. State, 794 So.2d 411 (Ala. 2000), the Alabama Supreme Court adopted the harmless-error analysis and held that a trial court's erroneous ruling on a challenge for cause was not a ground for automatic reversal. The Evans Court stated:
"As long as the jury that heard the case was impartial, the right guaranteed by [the Sixth and Fourteenth Amendments to] the United States Constitution was not violated. See [ Ross v. Oklahoma, 487 U.S. 81, 87-88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ]; see also United States v. Martinez-Salazar, 528 U.S. 304[, 120 S.Ct. 774, 145 L.Ed.2d 792] (2000). This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial 'by an impartial jury of the county or district in which the offense was committed.' The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6."
Evans, 794 So.2d at 414. See also Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala. 2002) ("Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an 'impartial' jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.); Dailey v. State, 828 So.2d 340 (Ala. 2001).
Henderson argues that "C.S.'s decades-long relationship with the victim that involved years of socializing between his daughters and Mr. Anderson, as well as continued interactions between the two men at ball games, established probable prejudice." (Henderson's brief, at p. 83.) Henderson vastly overstates the record. The fact that C.S.'s daughters worked on a couple of projects together with Deputy Anderson away from C.S.'s house in no way constitutes "years of socializing" with C.S.'s daughters. Deputy Anderson was 39 years old when he was killed, and C.S. did not state that his daughters had any ongoing contact with Deputy Anderson after they completed the high-school projects, and he provided nothing to support Henderson's claim that his daughters socialized with Deputy Anderson during or after high school. C.S. said he saw Deputy Anderson while going into the gates at the ball field, but he was unable to state how long before the deputy's death that had occurred. Furthermore, nothing in the record supports Henderson's current allegation that C.S. and Deputy Anderson had "continuing interactions" at ball games. In fact, Henderson stated at trial that Deputy Anderson was working the gate at the ball field, and that C.S. saw him there. (R. 1117.)
C.S. clearly stated that he could render a fair and impartial verdict, and that everyone is presumed innocent. The trial court was able to view C.S.'s demeanor and to consider it along with his answers to voir dire questions, and it denied Henderson's motion to strike C.S. for cause. The record provides no basis on which to conclude, as Henderson argues, that any acquaintance C.S. had with Deputy Anderson would have resulted in probable prejudice.
Furthermore, even if we had found error in the trial court's ruling, any error would have been harmless. Henderson *1036 failed to show that the jury that was impaneled was biased.
Therefore, Henderson is not entitled to relief based on the trial court's denial of Henderson's motion to strike C.S. for cause.
XIII.
Henderson next argues that the prosecutor made improper comments during closing argument.
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Crim. App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted)[abrogated by Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala. 2002) ]. Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Crim. App. 1987), aff'd, 534 So.2d 371 (Ala. 1988) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala. Crim. App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala. Crim. App. 1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala. Crim. App. 1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim. App. 1992).
"[S]tatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead v. State, 585 So.2d 97, 106-07 (Ala. Crim. App. 1989).
A.
Henderson argues that the State improperly told the jury that its "duty" was to convict him and, in doing so, the State violated United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), and Arthur v. State, 575 So.2d 1165, 1185 (Ala. Crim. App. 1990).
The State argued during its rebuttal argument, in relevant part:
"James would not have wanted to die. But he stopped the defendant. He stopped this defendant. He did his duty. Because the defendant absolutely meant to do what he did, because he did all of those little things ahead of time to do that, we are asking you to do your duty-"
(R. 2387.)
Henderson objected, and the trial court directed the prosecutor to rephrase the argument.[8]
*1037 The prosecutor then concluded its argument:
"Based upon the facts and evidence of this case, not on conjecture or anything else, we are asking you to find the defendant guilty of but one thing, and that's capital murder; the intentional killing of Deputy James Anderson while on duty."
(R. 2387.)
Immediately after the prosecutor rephrased the argument, the trial court asked, "Anything from either party?" (R. 2388.) Henderson stated that he wanted to address the prosecutor's argument at some point. The trial court asked the parties to approach the bench and asked Henderson whether he wanted the court to take the matter up at that point or to charge the jury first. Henderson told the court that he would take it up after the court charged the jury, and the prosecutor requested that, if the court felt the need for additional instruction on that point, the court give that instruction before the guilt-phase instructions. Henderson made a motion for a mistrial based on the prosecutor's argument in order to preserve that matter for the record. The court gave the jury the guilt-phase instructions. After the jury retired to deliberate, the trial court allowed Henderson to present his argument about the State's comment, and the following occurred:
"[HENDERSON]: [T]he prosecutor can't tell a jury that it's their duty to come back in a case to render justice or some type of verdict.
"And in this ... case, [the State] did that. And based on that, I want to specifically preserve that for appeal, because I don't want this under a plain error review standard.
"But I specifically preserve that for appeal, and based on that prosecutorial misconduct, I am asking for a motion for a mistrial.
"THE COURT: All right. Well, I don't know if a motion for a mistrial should be granted, but I think-if you think there should be some type of curative charge, I will be glad to hear that and we will-can bring the jury back out.
"[HENDERSON]: Your Honor, I don't know what curative charge you would give. Obviously, that would bring more attention to it by giving a curative charge.
"THE COURT: Well, I have already told the jury several times that they are not to consider as evidence the statements of counsel or anything I say in this courtroom. And I have read that again to the jury right through the charge. And I would be more than happy to bring them back out here and tell them that anything-they should not-that was just simply argument and they shouldn't consider it.
"[HENDERSON]: Well, again. Your Honor, you have already given them that instruction. I wouldn't want you to come back and tell them, hey, when the prosecutor said it's your duty, you can't consider that, that's not evidence. Again, I think it would bring more attention to it."
(R. 2462-64.)
The State replied that it was permitted to argue to the jury that, based on the evidence, it should find Henderson guilty. The trial court asked whether either party requested any type of curative instruction. Henderson stated that he did not. The trial court then denied Henderson's motion for mistrial. The trial court asked the parties if they were satisfied with the jury charge, the parties stated that they were satisfied, and discussion of the matter was concluded. (R. 2467.)
This Court has repeatedly considered arguments substantially the same as those *1038 raised here and has found no error. For example, when a prosecutor encouraged a jury to follow the law, do its duty, and do justice by convicting the defendant, we held:
"Reviewing the arguments of counsel in context, this Court finds that the prosecutor's comments were nothing more than proper pleas for justice. See Minor v. State, 914 So.2d 372, 421 (Ala. Crim. App. 2004) (' "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty." ' (quoting Price v. State, 725 So.2d 1003, 1033 (Ala. Crim. App.1997), aff'd, 725 So.2d 1063 (Ala. 1998) )). Further, even if the comments were improper, they did not ' " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' Sneed v. State, 1 So.3d [104,] at 138 [ (20017) ] (quoting Darden v. Wainwright, 477 U.S. [168,] at 181[, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ], quoting in turn Donnelly v. DeChristoforo, 416 U.S. [637,] at 643[, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ] )). See also McGowan v. State, 990 So.2d 931, 977 (Ala. Crim. App. 2003) ('Based on the foregoing, we find that the prosecutor did not commit plain error by his final remarks about the jury's oath. He did not, "in exhorting the jury to [honor its oath] ... imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law." ' (quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala. Crim. App. 1990) ))."
Riley v. State, 166 So.3d 705, 732 (Ala. Crim. App. 2013).
Furthermore, the trial court instructed the jury that its verdict was to be based solely on the evidence and that the arguments of counsel were not evidence and should not be considered as evidence in reaching the verdict. The prosecutor committed no error.
B.
To the extent Henderson is arguing that the trial court erred when it failed to issue a curative instruction to the jury about the prosecutor's remark, the issue is moot because, as we held above, the prosecutor committed no error when he argued to the jury that, after considering all the facts and evidence, it should do its duty and find Henderson guilty of capital murder.
C.
Henderson argues that, during his rebuttal closing argument, the prosecutor improperly vouched for his own credibility and for the credibility of the State's witnesses. He argues, for example, that the prosecutor stated that Henderson and his counsel would "stop at nothing," and that Deputy Bonham would not lie about what happened. Henderson did not object to any of the comments at trial; therefore, we review for plain error only.
The parties have a right during closing argument to present their reasonable impressions from the evidence and they may argue every legitimate inference from the evidence. E.g., Coral v. State, 628 So.2d 954, 985 (Ala. Crim. App. 1992). The prosecutor's comment about Deputy Bonham "was intended to draw inferences and sort and collate the evidence," Johnson v. State, 120 So.3d 1130, 1169 (Ala. Crim. App. 2009), and was an argument concerning the strength of the State's case. The prosecutor's references to Henderson's stopping at nothing referred primarily to Henderson's actions after he ran over Deputy Anderson, particularly that Henderson continued to try to drive his car and that he might have "played possum" and acted like he had been struck by a bullet Deputy Bonham fired in order to get her to move closer to him so he could inflict harm on her also. The comments *1039 were based on facts in evidence and reasonable inferences therefrom.
We find no plain error for the additional reason that the comments were replies in kind to Henderson's repeated arguments during his closing argument that the State had "gone to great lengths" to get the jury to ignore Henderson's intoxication and had attempted to keep evidence about his intoxication out of the case to prevent the jury from making an intelligent decision based on the truth and that, after he spoke to the prosecutor in the days before he testified, Dr. King had changed his opinion about whether Henderson was intoxicated at the time of the offense. (R. 2324-34.) "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala. Crim. App. 1993), aff'd, 651 So.2d 624 (Ala. 1994). See also Ex parte Taylor, 666 So.2d 73, 88 (Ala. 1995) ; Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala. 1993).
Moreover, even if the prosecutor's comments had constituted error, they would not have affected Henderson's substantial rights or had an unfair prejudicial impact on the jury's deliberations. Rule 45A, Ala. R. App. P.
Finding no plain error, we hold that Henderson is not entitled to relief on this claim.
XIV.
Henderson argues that the presentence investigation report ("PSI") was inadequate. Specifically, he argues: the probation and parole officer who completed the report had made no meaningful assessment of Henderson's familial relationships and the report mistakenly portrayed Henderson's familial relationships as harmonious, even though the record indicates otherwise; the report contains scant information on his mental disability and his military record; and it contained no entry in the section for a sentencing recommendation to the court. Henderson raises these arguments for the first time on appeal, so we review them for plain error.
Section 13A-5-47(b), Ala. Code 1975, requires the trial court to order and receive a PSI before it determines the sentence. Rule 26.3(b), Ala. R. Crim. P., states:
"(b) Content. The presentence report may contain:
"(1) A statement of the offense and the circumstances surrounding it;
"(2) A statement of the defendant's prior criminal and juvenile record, if any;
"(3) A statement of the defendant's educational background;
"(4) A statement of the defendant's employment background, financial condition, and military record, if any;
"(5) A statement of the defendant's social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
"(6) A statement of the defendant's medical and psychological history, if available;
"(7) Victim Impact Statements; and
"(8) Any other information required by the court."
The record reflects that the parties received copies of the PSI, and the trial court stated in its final sentencing order that it had received and considered the report.
In Wilson v. State, 142 So.3d 732, 800 (Ala. Crim. App. 2010) (opinion on return to remand), this Court addressed a similar challenge to the adequacy of a PSI and stated:
"[T]he circuit court here was presented with 'the full mosaic' of Wilson's background *1040 and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson's childhood, and from a childhood neighbor, who testified about Wilson's willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, 106 So.3d 441, 450 (Ala. 2011) (expressly refusing to hold that 'the adequacy of the presentence report should be evaluated in isolation')....
"Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R. App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala. Crim. App. 2008) (concluding there was 'no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information'). Accordingly, this issue does not entitle Wilson to any relief."
See also Jackson v. State, 169 So.3d 1, 91-92 (Ala. Crim. App. 2010), quoting Wilson.
During the sentencing hearing before the jury Henderson called his mother as a witness. Henderson's mother testified at length about Henderson's upbringing and his relationships with his family members and testified that Henderson openly showed his love toward his family. Her testimony included details about Henderson being sexually abused by her father; about his ADHD diagnosis and treatment; about his above-average academic performance in grade school and about the later decline in his grades; about his good relationship with his five children; about his employment history; and about her brother committing suicide when Henderson was about 15 years old, and about his lapse into depression for a long time after the incident because Henderson had been very close to his uncle. During the sentencing hearing before the judge Henderson admitted as exhibits copies of his academic reports and several psychological evaluations he had undergone during grade school and middle school. Henderson testified at the sentencing hearing before the trial judge. He described his history of drug abuse, and he testified about his diagnosis of ADHD and the medications he took for the disorder.
As in the cases cited above, the trial court had before it a vast amount of information about Henderson. Any inadequacy in the PSI did not constitute plain error.
To the extent Henderson argues that the PSI was inadequate because it did not contain a recommendation as to sentencing, Rule 26.3(b) does not suggest that a recommendation be included in the report. More importantly, this Court has stated that it did not approve or condone a parole officer's recommendation of punishment. E.g., Kuenzel v. State, 577 So.2d 474, 527 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala. 1991).
For the foregoing reasons, we find no support for Henderson's allegations of error with regard to the PSI. There being no error, and certainly no plain error, Henderson is not entitled to relief.
XV.
Henderson next argues that, at the sentencing hearing before the jury, the original copies contained in State's Exhibit 1, Henderson's criminal history, were submitted to the jury, even though the parties had agreed that the exhibit should be redacted to eliminate any reference to a misdemeanor conviction and to charges for traffic offenses that had been dismissed. Henderson argues that the records contained evidence of prior bad acts and that *1041 Rule 404(b), Ala. R. Evid., was violated. This argument is being raised for the first time, so we review it for plain error only. We find no plain error.
Henderson's argument is based purely on speculation. He contends that an unredacted copy of his criminal history was submitted to the jury, but the record does not support that assertion. Rather, the record discloses that Henderson stated that he had no objection to the State's presenting to the jury a portion of State's Exhibit 1, certified copies of his two prior felony convictions-one for aggravated assault and one for possession of a controlled substance. The State asked the trial court for permission to remove from its exhibit a page that referred to a misdemeanor traffic conviction, and the trial court allowed it. Henderson then told the trial court that State's Exhibit 1 also contained a reference to an arrest for armed robbery and that the case had been nolle prossed. He asked that the information be redacted from the exhibit; the trial court told the State that it should be redacted; and the State agreed to redact the information. The trial court admitted State's Exhibit 1 into evidence. The State then requested that State's Exhibit 1 in its entirety be admitted as an exhibit for the court record and that only the redacted version go to the jury. The trial court agreed and stated that State's Exhibit 1 would become a Court Exhibit, and that the redacted version of the exhibit, a photocopy of that exhibit with the agreed-upon information blacked out, would go to the jury. The trial court then asked the parties whether they had checked the redacted photocopy, and the parties stated that they had done so. During closing argument the State told the jury that it had introduced an exhibit of a certified prior conviction for aggravated assault, and that it had introduced testimony establishing that, at the time of the crime, Henderson was on parole for unlawful possession of methamphetamine and aggravated assault.
After the trial court charged the jury, Henderson asked to look at State's Exhibit 1 before it went to the jury. He objected to the indictment for aggravated assault going to the jury, and the trial court agreed to exclude the indictment from the exhibit and allowed the court reporter to remove that page from State's Exhibit 1. When the exhibit had been redacted and Henderson reviewed it, he stated: "The defense is satisfied State's Exhibit One is redacted." (R. 2709.)
As demonstrated above, the record contradicts Henderson's assertion that, "[e]ven with the State's concession and the trial court's granting of Mr. Henderson's motion to the redact the records, the record does not demonstrate that these criminal records were properly redacted." (Henderson's brief, at p. 91.) Therefore, Henderson is not entitled to relief on this claim of error.
XVI.
Henderson argues that his due-process rights were violated when the trial court failed to give specific reasons for shackling him during the penalty phase of the trial and that he was unjustifiably restrained with leg irons that were visible to the jury. He cites Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), and Brown v. State, 982 So.2d 565 (Ala. Crim. App. 2006), in support of this argument. Henderson did not raise this objection in the trial court, so we review for plain error.
In Deck, the United States Supreme Court stated: "[W]e must conclude that courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." Deck, 544 U.S. at 634, 125 S.Ct. 2007. (Emphasis added.)
*1042 Henderson candidly admits that the record does not reflect that the jury could see his leg irons. (Henderson's brief, at p. 94 n.48.)
This Court has repeatedly held that it will not find plain error based on a silent record, and an error must be obvious on the face of the record or it cannot rise to the level of plain error. E.g., Ex parte Walker, 972 So.2d 737, 755 (Ala. 2007) ("Speculation from a silent record will not support a finding of prejudice.). Carroll v. State, 215 So. 3d 1135, ---- (Ala. Crim. App. 2015), Woodward v. State, 123 So.3d 989, 1006 (Ala. Crim. App. 2011).
Furthermore, the record shows that there was no basis at trial for an objection based on Deck because Henderson's restraints were never visible to the jury. Rather, Henderson asked the trial court whether, if he were to take the stand, the court would prefer him to testify from counsel's table because he was wearing leg irons. The trial court stated that Henderson could "either testify from the table or we can take a recess and we can take the leg irons off of him." (R. 2535.) The State objected to the removal of the leg irons based on a report from an officer on the security detail that Henderson had acted out the day before. The State indicated that Henderson could testify from the stand in leg irons and could be moved to and from the witness stand outside the presence of the jury. The trial court stated that, before it would allow that to happen, the State was "going to have to bring whoever this officer is and ... have a hearing outside the presence of the jury regarding that." (R. 2536.) The court stated that it would not mind if Henderson testified from counsel's table. (Id. ) Henderson said he wanted to be sure that the jury could hear him if he testified from counsel's table, and the court stated that the distance between the jury and counsel's table was not far and the jury should have no difficulty hearing Henderson's testimony but that, if the jury did have difficulty, the court would take a break and adjust. Henderson then stated:
"Your Honor, if for some reason he did-we ended up having to put him on the stand prior to the jury coming in here, obviously, I would ask that the jury be dismissed before he be removed from the stand, you know, so the jury didn't see the leg irons. You know, if we went to that point. Obviously, most witnesses get off the stand and, defense, call your next witness."
(R. 2537-38.)
The trial court then said that, if Henderson were to take the stand in leg irons, first, the officer who believed Henderson was a security risk would have to testify outside the presence of the jury. (R. 2538.) Henderson subsequently informed the trial court that he was going to testify on his own behalf. The trial court asked whether he was going to testify from counsel's table or from the witness stand. Henderson stated that he would prefer to sit at counsel's table, and the State indicated it had no objection. After a bench discussion was held outside the hearing of the court reporter, the trial court stated, "Make sure his shackles don't show," and defense counsel said, "That's what I was going to do." (R. 2627.) Henderson apologized to Deputy Anderson's family members and asked for their forgiveness. Before the State cross-examined Henderson, defense counsel asked the court whether Henderson could remain seated, and the trial court said that would be fine. (R. 2630.)
It is clear from the foregoing discussion that the trial court went to great lengths to be sure that Henderson's rights were protected and that the jury did not see him in restraints. Because Henderson did not appear before the jury in visible restraints, *1043 there was no violation of the principles announced in Deck.
Moreover, in McWhorter v. State, 142 So.3d 1195, 1263 (Ala. Crim. App. 2011), we stated:
"In Alabama, it has consistently been held that
" ' "[b]ringing a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial." Brock v. State, 555 So.2d 285, 288 (Ala. Crim. App. 1989), on return to remand, 580 So.2d 1390 (Ala. Crim. App. 1991). The decision to restrain a defendant rests with the trial judge, and, absent an abuse of discretion, this Court will not disturb his ruling on appeal. Id. at 289. "Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them." Id. (internal citation and quotation marks omitted). "It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury." Perkins v. State, 808 So.2d 1041, 1079 (Ala. Crim. App. 1999), aff'd, 808 So.2d 1143, 1145 (Ala. 2001) [, vacated and remanded, 536 U.S. 953[, 122 S.Ct. 2653, 153 L.Ed.2d 830] (2002), aff'd on remand, 851 So.2d 453 (Ala. 2002) ].'
" McCall v. State, 833 So.2d 673, 676 (Ala. Crim. App. 2001) (holding that, although the trial judge failed to state his reasons for requiring an inmate witness to testify in shackles and prison clothing, defendant failed to show that he had suffered any prejudice). See also Brock v. State, 555 So.2d 285, 289 (Ala. Crim. App. 1989) (holding that, although the facts of that case did not 'explicitly indicate a fear by the court that the defendant would attempt to escape, it is not reversible error for a trial court to allow a defendant to be brought into the courtroom handcuffed'). ' "It is not ground for mistrial that the accused appeared before the jury in handcuffs when his appearance was only a part of going to and from the courtroom." ' Justo v. State, 568 So.2d 312, 318 (Ala. Crim. App. 1990) (quoting Cushing v. State, 455 So.2d 119, 121 (Ala. Crim. App. 1984) ). Whether a defendant may be handcuffed for purposes of being taken to and from the courtroom is left to the discretion of the trial court. McWilliams v. State, 640 So.2d 982 (Ala. Crim. App. 1991)."
Therefore, even if we had found that error occurred as a result of Henderson's wearing shackles during the trial without the trial court's explanation of its reasons for allowing the restraints, and we do not so hold, it would have been incumbent upon Henderson "to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them," and Henderson did not even attempt to do so. Furthermore, Henderson has not demonstrated that he suffered any prejudice.
For all of the foregoing reasons, we hold that no error, and certainly no plain error occurred, and Henderson is not entitled to relief.
XVII.
Henderson argues that the trial court and the State misled the jury as to its role at sentencing because, he says, they repeatedly referred to the jury's decision as a "recommendation." Henderson did not raise this objection at trial, so our review is for plain error only.
Both the State and the trial court informed the jury that its penalty-phase verdict was a "recommendation." Section 13A-5-46, Ala. Code 1975, repeatedly refers to the jury's role in the penalty phase *1044 of a capital case as rendering an advisory verdict recommending a sentence to the circuit judge. Section 13A-5-47, Ala. Code 1975, provides that the circuit judge ultimately determines the capital defendant's sentence, taking into consideration "the recommendation of the jury contained in its advisory verdict." § 13A-5-47(e), Ala. Code 1975.
This Court has consistently held that no error results from informing a jury that its role in the penalty phase of the trial is to provide a "recommendation" or that it is "advisory." E.g., Phillips v. State, [Ms. CR-12-0197, Dec. 18, 2015] --- So. 3d ----, ---- (Ala. Crim. App. 2015), and cases cited therein.
No error, and certainly no plain error, occurred as a result of the State's comments or the trial court's jury charge, and Henderson is not entitled to any relief.
XVIII.
Henderson argues in his opening brief that his death sentence was imposed in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because, he says, " Ring invalidates critical aspects of Alabama's capital sentencing scheme and renders his death sentence unconstitutional." (Henderson's brief, p. 96.) He acknowledges that the Alabama Supreme Court's decision in Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002), is contrary to his position on appeal. Nonetheless, Henderson argues: that the jury did not unanimously and beyond a reasonable doubt find either that statutory aggravating circumstances existed or that the aggravating circumstances outweighed the mitigating circumstances; that he was unconstitutionally sentenced to death without notice in the indictment of any aggravating circumstances that made him eligible for the death penalty; that the Alabama Supreme Court in Waldrop impermissibly eased the State's burden of proving that the death penalty is appropriate by failing to inform the jury that its guilty verdict, alone, could authorize the trial judge to impose the death penalty; and that judicial override in this case violated the Eighth and Fourteenth Amendments to the United States Constitution because, he says, it failed to assign to the jury the role as the final sentencer.
While this case was pending, the United States Supreme Court released Hurst v. Florida, --- U.S. ----, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), and addressed the constitutionality of a portion of Florida's capital-murder statute. The parties submitted supplemental briefs to this Court and presented arguments as to the impact Hurst has, if any, on this case. Henderson argues in his supplemental brief that the trial court's decision to override the jury's recommended sentence of life imprisonment without the possibility of parole was in direct violation of Hurst. He argues, specifically, that the jury never made a fact-finding that the aggravating circumstances outweighed the mitigating circumstances; that the ultimate decision to impose the death sentence was made by the trial court, not the jury and, in making that decision, the trial court relied on information not presented to the jury; to the extent the trial court relied on the jury's findings regarding aggravating circumstances, those findings were undermined by the court's instruction to the jury that its sentencing determination was an advisory verdict; that Alabama's death-penalty scheme is unconstitutional under Hurst because Alabama's scheme has the same defect as Florida's in that the judge in Florida made the ultimate sentencing determination.
On September 30, 2016, the Alabama Supreme Court in Ex parte Bohannon, 222 So. 3d 525(Ala. 2016), extensively analyzed Hurst. The Alabama Supreme Court *1045 noted that Hurst was based on Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which held that any fact that increases a penalty above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt, and Ring v. Arizona 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which extended the holding in Apprendi to death-penalty cases. The Court stated: " Ring held in a capital case, the Sixth Amendment right to a jury trial requires that the jury unanimously find beyond a reasonable doubt the existence of at least one aggravating circumstance that would make the defendant eligible for a death sentence." Bohannon, at 528. The Court quoted extensively from Ex parte Waldrop, supra, in which it considered whether, in light of Apprendi and Ring, Alabama's capital-sentencing scheme was constitutional, and the Court held that it was constitutional. The Bohannan Court stated that it had held in Waldrop that § 13A-5-45(f), Ala. Code 1975, requires that at least one statutory aggravating circumstance enumerated in § 13A-4-49, Ala. Code 1975, exist in order for a defendant convicted of a capital offense to be sentenced to death, and that the jury had found an aggravating circumstance beyond a reasonable doubt when it found Waldrop guilty of murder during the commission of a robbery. The Bohannon Court also quoted Waldrop for the proposition that the determination of the relative weight of aggravating and mitigating circumstances was not a finding of fact and, therefore, that Ring and Apprendi do not require that a jury conduct that process.
In Bohannon, the Court also stated:
"In Ex parte McNabb, 887 So.2d 998 (Ala. 2004), this Court further held that the Sixth Amendment right to a trial by jury is satisfied and a death sentence may be imposed if a jury unanimously finds an aggravating circumstance during the penalty phase or by special-verdict form. McNabb emphasized that a jury, not the judge, must find the existence of at least one aggravating factor for a resulting death sentence to comport with the Sixth Amendment."
Bohannon, 222 So. 3d at 531.
The Court then discussed Hurst and its holding that Florida's sentencing scheme was unconstitutional because it required the judge-not the jury-to find the existence of an aggravating circumstance. The Bohannon Court then addressed Bohannon's arguments:
"Bohannon contends that, in light of Hurst, Alabama's capital-sentencing scheme, like Florida's, is unconstitutional because, he says, in Alabama a jury does not make 'the critical findings necessary to impose the death penalty.' --- U.S. ----, 136 S.Ct. at 622. He maintains that Hurst requires that the jury not only determine the existence of the aggravating circumstance that makes a defendant death-eligible but also determine that the existing aggravating circumstance outweighs any existing mitigating circumstances before a death sentence is constitutional. Bohannon reasons that because in Alabama the judge, when imposing a sentence of death, makes a finding of the existence of an aggravating circumstance independent of the jury's fact-finding and makes an independent determination that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances found to exist, the resulting death sentence is unconstitutional. We disagree.
"Our reading of Apprendi, Ring, and Hurst leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment. As previously recognized, Apprendi *1046 holds that any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury. Ring holds that the Sixth Amendment right to a jury trial requires that a jury 'find an aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 585. Hurst applies Ring and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. Ring and Hurst require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty-the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.
"Moreover, Hurst does not address the process of weighing the aggravating and mitigating circumstances or suggest that the jury must conduct the weighing process to satisfy the Sixth Amendment. This Court rejected that argument in Ex parte Waldrop, holding that that the Sixth Amendment 'do[es] not require that a jury weigh the aggravating circumstances and the mitigating circumstances' because, rather than being 'a factual determination,' the weighing process is 'a moral or legal judgment that takes into account a theoretically limitless set of facts.' 859 So.2d at 1190, 1189. Hurst focuses on the jury's factual finding of the existence of a aggravating circumstance to make a defendant death-eligible; it does not mention the jury's weighing of the aggravating and mitigating circumstances. The United States Supreme Court's holding in Hurst was based on an application, not an expansion, of Apprendi and Ring; consequently, no reason exists to disturb our decision in Ex parte Waldrop with regard to the weighing process. Furthermore, nothing in our review of Apprendi, Ring, and Hurst leads us to conclude that in Hurst the United States Supreme Court held that the Sixth Amendment requires that a jury impose a capital sentence. Apprendi expressly stated that trial courts may 'exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment within the range prescribed by statute.' 530 U.S. at 481. Hurst does not disturb this holding.
"Bohannon's argument that the United States Supreme Court's overruling in Hurst of Spaziano v. Florida, 468 U.S. 447[, 104 S.Ct. 3154, 82 L.Ed.2d 340] (1984), and Hildwin v. Florida, 490 U.S. 638[, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), which upheld Florida's capital-sentencing scheme against constitutional challenges, impacts the constitutionality of Alabama's capital-sentencing scheme is not persuasive. In Hurst, the United States Supreme Court specifically stated: 'The decisions [in Spaziano and Hildwin ] are overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty.' Hurst, --- U.S. ----, 136 S.Ct. at 624. (Emphasis added.) Because in Alabama a jury, not a judge, makes the finding of the existence of an aggravating circumstance that makes a capital defendant eligible for a sentence of death, Alabama's capital-sentencing scheme is not unconstitutional on this basis."
Bohannon, 222 So. 3d at 533. See also State v. Billups, [Ms. CR-15-0619, June 17, 2016] 223 So.3d 954, 963 (Ala. Crim. App. 2016) ("The Court in Hurst did nothing more than apply its previous holdings *1047 in Apprendi and Ring to Florida's capital-sentencing scheme. The Court did not announce a new rule of constitutional law, nor did it expand its holdings in Apprendi and Ring.... The Alabama Supreme Court has repeatedly construed Alabama's capital-sentencing scheme as constitutional under Ring. See, e.g., Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002) ; Ex parte Hodges, 856 So.2d 936 (Ala. 2003) ; Ex parte Martin, 931 So.2d 759 (Ala. 2004) ; Ex parte McNabb, 887 So.2d 998 (Ala. 2004) ; and Ex parte McGriff, 908 So.2d 1024 (Ala. 2004).").
We examine Henderson's arguments in light of Hurst and other relevant authorities.
A.
Henderson argues that Alabama's capital-sentencing scheme is unconstitutional under Hurst because, he says, Alabama's death-penalty statute is nearly identical to Florida's statute that was struck down by the United States Supreme Court. Henderson's argument fails under Bohannon.
B.
Henderson argues in his opening brief and his supplemental brief that his sentence must be reversed because, he says, constitutional principles require the jury to find unanimously and beyond a reasonable doubt that a statutory aggravating circumstance exists and that any aggravating circumstances it finds to exist outweigh any mitigating circumstances it finds to exist. He argues, too, that the ultimate decision to impose the death sentence must be made by the jury. The Alabama Supreme Court rejected these arguments in Bohannon.
The jury was properly instructed by the trial court about determining, unanimously and beyond a reasonable doubt, whether any aggravating circumstances existed and, if so, which aggravating circumstances it found to exist. The jury was provided with special interrogatories to complete during deliberations regarding its findings as to aggravating and mitigating circumstances. The jury's responses to those interrogatories established that the jurors found unanimously and beyond a reasonable doubt four aggravating circumstances to exist: that the capital murder was committed while Henderson was under sentence of imprisonment, § 13A-5-49(1) ; that Henderson had previously been convicted of a felony involving violence or the threat of violence to another person, § 13A-5-49(2) ; that Henderson committed the murder for the purpose of avoiding or preventing lawful arrest or to effect an escape from custody, § 13A-5-49(5) ; and that the offense was committed in order to hinder or disrupt the lawful exercise of a government function or enforcement of the laws, § 13A-5-49(7).
The jury's unanimous determination that even one aggravating circumstance existed beyond a reasonable doubt rendered Henderson eligible for the death penalty. Therefore, the mandate in Hurst was satisfied, and Henderson is not due any relief on this claim.
To the extent Henderson argues that Hurst prohibits jury-verdict override and, more specifically as in this case, when the trial court's decision was based on evidence not presented to the jury and when the jury was instructed that its sentencing determination was a recommendation, each of those arguments has been rejected. In Ex parte Billups, this Court stated:
"The Court in Hurst also did not hold ... that judicial sentencing in capital cases is unconstitutional or that it is unconstitutional to allow a trial court, in determining the appropriate sentence in a capital case, to consider evidence that was not presented to the jury. Although *1048 the Court in Hurst found that a jury's capital-sentencing recommendation alone was not sufficient to establish that the jury found the facts necessary for imposition of the death penalty under Florida's capital-sentencing scheme, the Court did not state, or even imply, that it is constitutionally required that a jury, and not a judge, make the ultimate decision whether to sentence a defendant to death or to life imprisonment without the possibility of parole. Indeed, in reaching its decision in Hurst, the Court relied on its holdings in Apprendi and Ring, and ... the Court in Apprendi specifically found that it was permissible 'for judges to exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing judgment within the range prescribed by statute.' Apprendi, 530 U.S. at 481."
Ex parte Billups, 223 So.3d at 962.
As to his argument that the jury's findings regarding aggravating circumstances were undermined by the trial court's instructions that the jury's verdict was advisory, our Court has consistently held that no error occurs when a trial court informs a jury that its sentencing determination is advisory or a recommendation. E.g., Albarran v. State, 96 So.3d 131, 210 (Ala. Crim. App. 2011), and cases cited therein.
C.
In his opening brief Henderson argues that his death sentence is unconstitutional because his indictment did not allege any aggravating circumstances. This Court has specifically rejected Henderson's argument and has held repeatedly that aggravating circumstances do not have to be alleged in a capital-murder indictment. E.g., Woodward v. State, 123 So.3d 989, 1053-54 (Ala. Crim. App. 2011) ; Lewis v. State, 24 So.3d 480, 534-35 (Ala. Crim. App. 2006), aff'd, 24 So.3d 540 (Ala. 2009) ; Stallworth v. State, 868 So.2d 1128, 1186 (Ala. Crim. App. 2001). Hurst did not address this issue and, therefore, nothing in Ring, Apprendi, or Hurst supports Henderson's argument.
D.
Henderson argues in his opening brief that Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002), impermissibly eased the State's burden of proving that the death penalty was warranted by failing to inform the jury that a guilty verdict, alone, can render a defendant eligible for the death sentence in cases in which an element of the capital offense necessarily includes a finding of an aggravating circumstance. We are bound by the decisions of the Alabama Supreme Court. See, e.g., Revis v. State, 101 So.3d 247, 327 (Ala. Crim. App. 2011). More importantly, however, this is not a case in which the jury's guilty verdict, alone, would have permitted the trial court to impose a death sentence, so Henderson's argument is irrelevant.
Henderson is due no relief on his claims that his death sentence must be reversed based on the holdings in Ring, Apprendi, and Hurst.
XIX.
As required by § 13A-5-53, Ala. Code 1975, we must consider the propriety of Henderson's capital-murder conviction and the sentence of death. This statutory review includes our determination of whether any error adversely affecting Henderson's rights occurred during the sentencing proceedings; whether the trial court's findings regarding the aggravating circumstances and the mitigating circumstances were supported by the evidence; and whether death is the appropriate sentence.
Section 13A-5-53(b) requires that this Court determine: whether the sentence of death was imposed under the influence of *1049 passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Henderson was convicted pursuant to § 13A-5-40(a)(6), Ala. Code 1975, for the intentional murder of an on-duty law-enforcement officer, Deputy James Anderson. The record shows that Henderson's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
By answering a series of special interrogatories regarding aggravating circumstances pursuant to § 13A-5-49, Ala. Code 1975, the jury found unanimously: that the capital murder was committed while Henderson was under sentence of imprisonment, § 13A-5-49(1) ; that Henderson had previously been convicted of a felony involving violence or the threat of violence to another person, § 13A-5-49(2) ; that Henderson committed the murder for the purpose of avoiding or preventing lawful arrest or to effect an escape from custody, § 13A-5-49(5) ; and that the offense was committed in order to hinder or disrupt the lawful exercise of a government function or enforcement of the laws, § 13A-5-49(7). The trial court found the same four aggravating circumstances to exist. The trial court found no statutory mitigating circumstances to exist, but it found the following nonstatutory mitigating circumstances to exist: that Henderson had expressed remorse; that Henderson was under the influence of methamphetamine at the time of the offense; that Henderson had been diagnosed as having an antisocial-personality disorder and displaying poor judgment; that Henderson had no violent disciplinary infractions while he was in jail awaiting trial; that Henderson joined the Navy when he was 19 years old; and that Henderson had a good relationship with his children. The trial court's findings as to the aggravating circumstances and the mitigating circumstances are supported by the evidence.
In accordance with § 13A-5-53(b)(2), this Court has independently weighed the aggravating and the mitigating circumstances, and we are convinced that the death penalty is the appropriate sentence in this case.
In accordance with § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Henderson's sentence is disproportionate or excessive to penalties imposed in similar cases, and we find that Henderson's sentence is neither. See Woodward v. State, 123 So.3d 989 (Ala. Crim. App. 2011) ; Albarran v. State, 96 So.3d 131 (Ala. Crim. App. 2011) ; Woods v. State, 13 So.3d 1 (Ala. Crim. App. 2007) ; McNabb v. State, 887 So.2d 929 (Ala. Crim. App. 2001), aff'd, 887 So.2d 998 (Ala. 2004).
Last, as required by Rule 45A, Ala. R. App. P., we have searched the record for any error that may have adversely affected Henderson's substantial rights and we have found none.
For the foregoing reasons, we affirm Henderson's capital-murder conviction and sentence of death.
AFFIRMED.
Windom, P.J., and Burke, J., concur. Joiner, J., concurs specially, with opinion. Welch, J., dissents, with opinion. Kellum, J., dissents.
JOINER, Judge, concurring specially.
I concur fully in the main opinion. I write separately to address two arguments made in the dissenting opinion.
*1050 I.
First is the dissenting opinion's assertion that Harris v. State, 873 So.2d 1171 (Ala. Crim. App. 2003), "blatantly disregarded the holding of" Ex parte Cobb, 703 So.2d 871 (Ala. 1996). If that is the case, I would note that in the more than 13 years since Harris was decided, the Alabama Supreme Court has never overruled Harris, despite having had multiple opportunities to do so. See, e.g., Belisle v. State, 11 So.3d 256, 312-313 (Ala. Crim. App. 2007) (holding that a six-pound can of peas could be a "deadly weapon"), cert. denied, 11 So.3d 323 (Ala. 2008).
The simple holding of Ex parte Cobb is that "a human fist" or hand-as a human body part-is not similar to the inanimate objects listed in the definition of "deadly weapon" in § 13A-1-2(7), Ala. Code 1975. The distinction between a human body part and an automobile is a relatively easy one: an automobile that weighs thousands of pounds is quite unlike a human hand.
II.
Second is the dissenting opinion's assertion that "[t]he jury was instructed repeatedly that it could find that [Gregory Lance] Henderson acted with the specific intent to kill Deputy [James] Anderson based solely on the fact that he struck the deputy with his vehicle." (Emphasis added.) This is, I think, an overstatement. If the instructions had been as clear as the dissenting opinion characterizes them-and they were not-any reasonable defense attorney would have objected.
In the instructions quoted by the dissenting opinion, the only instance I see in which the instruction as characterized therein could be inferred is the circuit court's use of the disjunctive "and/or" in its statement: "Intent may be presumed from the act of using a dangerous instrument and/or from the character of the assault, including the nature and the amount of force used in the fatal injury." The circuit court, however, repeatedly instructed the jury to look to the "circumstances" to determine whether the requisite intent existed. Moreover, the circuit court thoroughly instructed the jury regarding less culpable mental states as well. Under these circumstances, I am convinced there was no plain error in the circuit court's instructions to the jury.

It is unclear from the record whether the conversation took place days before the murder, or whether it took place the summer before the murder, because both time frames were referenced.

The State's requested jury charge no. 4 stated: "Intent may be presumed from the act of using a deadly weapon and from the character of the assault, including the nature and amount of force used in the fatal injury." (C. 305.)(Emphasis added.) The parties and the trial court agreed to substitute "dangerous instrument" for "deadly weapon," and the State's proposed jury charge was given to the jury.

Henderson argued at closing that Dr. King had not changed his opinion about Henderson's intoxication based on his review of either the nurse's notes or the toxicology report because, he said, Dr. King had already reviewed both before he evaluated Henderson. (R. 2333.) Rather, he argued, Dr. King "changed his mind when he talked to the DA's Office ...." (R. 2334.)

Four of the questions were designated as optional; those were related to religion and political-party preference.

In its brief the State points out that Henderson provided no record citation in support of his claim that the State created two lists and that Henderson's unsupported assertion is due no credence. Curiously, in his reply brief Henderson responds to the State's argument by stating, in relevant part: "While the State relies on the fact that the lists are not in the record, the State does not need to have actually produced physical lists, although it very well may have, to sustain the claim." (Henderson's reply brief, at p. 20.) Obviously, the State could not produce lists that do not exist; furthermore, Henderson had the duty to provide this Court with a complete record on appeal, and the Court will not presume error from a silent record. E.g., Welch v. State, 63 So.3d 1275 (Ala. Crim. App. 2010).

Barfield testified that her nickname was "Alex," and Henderson testified that during a telephone call he made from jail he asked someone to talk to Barfield before she testified. (R. 2844.)

Henderson also cites Henderson v. State, 715 So.2d 863, 865 (Ala. Crim. App. 1997), for the proposition that the trial court should charge the jury on the use of expert testimony in the cases where expert testimony was given, but the statement on which he relies is dicta. " 'Because obiter dictum is, by definition, not essential to the judgment of the court which states the dictum, it is not the law of the case established by that judgment. Gray v. Reynolds, 553 So.2d 79, 81 (Ala. 1989).' Ex parte Williams, 838 So.2d 1028, 1031 (Ala. 2002)." Woodward v. State, 123 So.3d 989, 1034 n.10 (Ala. Crim. App. 2011).

Henderson stated that the argument violated "Caldwell." It appears that he mistakenly cited Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which holds "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Henderson later acknowledged that he had referred to the wrong case.